# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| STEPHEN A. WOLF, | ) | Case No. 11- B- 00701 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| -------------------------------------------------- | ) | |
| ATTORNEYS' TITLE GUARANTY | ) | |
| FUND, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 11-A-00966 |
| | ) | |
| STEPHEN A. WOLF, | ) | |
| | ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT SEEKING A
## DETERMINATION OF THE DISCHARGEABILITY OF DEBT

Plaintiff, Attorneys' Title Guaranty Fund, Inc. ("ATG"), a creditor of Debtor, Stephen A. Wolf ("Wolf"), pursuant to Sections 523 (a)(2)(A) and 523 (a)(6) of Title 11, United States Code (the "Bankruptcy Code"), for its Second Amended Complaint Seeking a Determination of the Dischargeability of a Debt, states as follows:

### PARTIES AND JURISDICTION

1. ATG is an Illinois corporation with its principal place of business in Chicago, Illinois.

2. Upon information and belief, Wolf is an individual domiciled at 2164 Second Street, Northbrook, Illinois.

3.  On January 10, 2011, Wolf filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, thereby commencing bankruptcy proceeding No. 11-B-00701.

4.  This Second Amended Complaint alleges claims under 11 U.S.C. §§ 523(a)(2)(A) and 523 (a)(6).

5.  This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 1334(b), applicable rules of this Court, and other applicable orders of the United States District Court for the Northern District of Illinois.

6.  Venue is proper in this District because Wolf filed his bankruptcy proceeding in this District and he is domiciled in this District.

## COMMON FACTS

### A. The Niles Property.

7.  In 2002, an individual named Joseph Gambino ("Gambino") owned the beneficial interest of certain property held in a land trust and located at 7460 North Milwaukee Avenue, Niles, Illinois (the "Niles Property"). North Star Trust Company ("North Star") was the trustee of that land trust. Gambino also owned a motor vehicle transmission repair business, which was located on the Niles Property, and at least two other properties (both of which were also held in a land trust). In 2002, Gambino was approximately 69 years old.

8.  In and around October of 2002, Gambino had been having discussions with his nephew, Salvatore DiBenedetto ("Sal"), about Gambino's financial difficulties, which included overdue payroll and property taxes.

9.  In the fall of 2002, Sal and Wolf discussed Gambino's financial distress and whether Wolf might somehow assist with a transaction involving the Niles Property, purportedly

to ease Gambino's financial distress. Wolf eventually involved one of his associates, an individual named Reuben Zippershtein ("Zippershtein"). Zippershtein purportedly agreed to loan Gambino $200,000 for one year, secured by a mortgage on the Niles Property. Zippershtein required, however, that Gambino remove title to the Niles Property from the land trust and hold it personally.

### B.     The December 2002 Transaction.

10.     On or about December 20, 2002, a closing occurred regarding the Niles Property. As a result of the closing, (a) a trustee's deed was issued purportedly conveying title to the Niles Property from the North Star land trust to Gambino personally; (b) Gambino purportedly issued a letter of direction and signed various closing documents, to allow the conveyance of title; and (c) Zippershtein recorded a mortgage on the Niles Property for $200,000, the amount of his purported loan. Wolf was present at this closing, but Gambino was not.

11.     As a result of the closing, varying disbursements were made from the loan proceeds. Wolf received a disbursement of $5,250. Wolf's son, Adam Wolf, received a disbursement of $4,000. Sal received a disbursement of $25,000. $33,000 was placed into escrow to secure the first 11 months of mortgage payments. Other disbursements went to pay back taxes and various fees.

12.     In actuality, Gambino had not approved the transactions purportedly taking place at the December 2002 closing. The signatures on the trustee's deed conveying title from the North Star land trust to Gambino were forged. He did not sign the various closing documents and did not authorize Zippershtein to place a mortgage on the Niles Property.

### C. The June 2004 Transaction.

13. In or around January of 2004, an individual named Stephen Fritzshall ("Fritzshall"), who was Zippershtein's attorney, contacted Gambino and demanded repayment of the $200,000 "loan" Zippershtein has made to Gambino (that had been secured by a mortgage on the Niles Property). On January 14, 2004, Gambino told Fritzshall that he was not aware a mortgage had been placed on the Niles Property and denied that he had entered into a loan agreement with Zippershtein.

14. Thereafter, Zippershtein filed a lawsuit in the Circuit Court of Cook County, Illinois seeking to foreclose his mortgage on the Niles Property. Zippershtein thereafter voluntarily dismissed his action, with the agreed order of dismissal stating that the "debt at issue was paid in full."

15. On or about June 18, 2004, a second closing took place involving the Niles Property. This transaction was purportedly a refinance. As part of this transaction, an entity called W.W. Funding, LLC ("WW Funding") purportedly would purchase the Niles Property from Gambino and pay off the Zippershtein loan and release the Zippershtein mortgage. WW Funding would then grant an individual named Dennis Koonce ("Koonce") an option to repurchase the property for $230,000.

16. Wolf controlled WW Funding, and one of its two members was an entity called the Wolf Real Estate Partnership, L.P.

17. As part of this June 2004 closing, Gambino purportedly signed documents (a) allowing WW Funding to purchase the Niles Property, and (b) granting Koonce the option to repurchase it.

18. WW Funding funded its purchase by borrowing $445,000 from Plaza Bank (even though Zippershtein was only owed about $231,000). Wolf signed a personal guarantee for Plaza Bank's loan to WW Funding.

19. In connection with the closing, Plaza Bank recorded a mortgage against the Niles Property to secure its loan to WW Funding. The mortgage was dated June 18, 2004, and was recorded July 8, 2004, in Cook County, Illinois, as document number 0419005014.

20. In connection with the June 2004 closing and at Wolf's request, ATG issued two policies of title insurance, both dated July 8, 2004, described as follows:

    a. An Owner Title Insurance Policy for $231,680.08, insuring title in WW Funding, and copy of this policy is attached as Exhibit A; and

    b. A Mortgagee Title Insurance Policy for $445,000.00, insuring Plaza Bank, and a copy of this policy is attached as Exhibit B.

21. Before requesting ATG to issue the title insurance policies, Wolf did not advise ATG that Wolf was participating in a scheme that would deprive Gambino of his ownership interest in the Niles Property. In reliance on Wolf's omissions, which were material, ATG issued both title policies.

22. But for ATG issuing title insurance, Plaza Bank would not have loaned WW Funding the sum necessary to purchase the Niles Property, and WW Funding would not have been able to complete the June 2004 transaction.

23. As a result of the June 2004 closing, Zippershtein received $231,680.08 (purportedly to pay off his mortgage) and WW Funding received $135,171.38 – although it was the purported purchaser of the Niles Property. Various other distributions were made for varying

purposes, such as fees and taxes, but Gambino did not receive anything from the sale of the Niles Property.

24.     As with the December 2002 closing, the June 2004 closing was a sham. Gambino did not agree to sell the Niles Property to WW Funding and did not agree to give Koonce an option to purchase the Property. Gambino's signature on the warranty deed conveying the Niles Property to WW Funding was forged, as were the other documents necessary for the transaction to close.

### D.     Gambino and North Star File Suit.

25.     In March 2005, after finding out the full extent of the transactions that they did not authorize, Gambino and North Star filed suit in the Circuit Court of Cook County, Illinois, to quiet title to the Niles Property and seeking damages for slander of title. The suit was styled *Gambino v. WW Funding, LLC, et al.*, case no. 05 CH 4303 (the "Litigation").

26.     The Litigation was not limited to the Niles Property. Gambino and North Star also sought to quiet title to and obtain damages relating to two other pieces of property. There were numerous defendants in the Litigation, including WW Funding, Wolf, Plaza Bank, Sal and Koonce. Many of the defendants overlapped with respect to the other properties at issue, and Gambino generally alleged that he had been the victim of a scheme designed to steal title to his three properties.

27.     WW Funding (through Wolf) tendered its defense of the Litigation to ATG, as did Plaza Bank, under ATG's policies of title insurance. ATG thereafter defended both WW Funding and Plaza Bank in the Litigation.

28.     The Litigation proceeded through discovery and went to trial in the fall of 2007.

29.     On November 30, 2007, after the trial had concluded, Judge Nancy J. Arnold issued a 21-page Finding of Fact and Judgment After Trial, a copy of which is attached as Exhibit C hereto. ATG expressly adopts and incorporates the findings contained in Exhibit C.

30.     Judge Arnold granted substantially all of the relief that Gambino and North Star requested. Specifically, she found that the defendants had never obtained title to the Niles Property, or the other properties at issue. Rather, they had relied upon a series of forged documents.

31.     In support of her findings, Judge Arnold determined that: (a) the signatures of the North Star land trust officers, who had purportedly signed the document transferring title to the Niles Property out of the land trust and conveying it to Gambino, were forged; (b) the notary public who notarized Gambino's signatures admitted that she never saw him sign any of the documents, but rather she merely notarized whatever Sal asked her to notarize (including the deed purportedly conveying title to the Niles Property to WW Funding); and (c) the testimony of an expert witness, that the signatures on the relevant documents were not Gambino's, was "extremely credible, thoroughly articulated, and well-supported." In total, Judge Arnold found that Gambino and North Star's "proof was overwhelming."

32.     At the trial, Wolf testified that he had met with Gambino to discuss WW Funding's purchase of the Niles Property, and that he had no reason to suspect Gambino's signatures had been forged. Judge Arnold held that she "flatly disbelieve[d] this testimony," and she further found that it was "strange testimony, inherently unbelievable and shown to be so."

33. Judge Arnold further found that Wolf's testimony undercut Wolf's own defense since neither Gambino nor his attorney appeared at the closing, whereas it was customary that either the seller or his attorney would have been present.

34. Judge Arnold also found that there was "no adequate explanation" for the "significant deviation" during the June 2004 closing from what Wolf described as his typical loan structure. Wolf testified that his normal loan structure would include providing the person in Gambino's situation with an option to repurchase the subject property at a later date by repaying the loan plus costs. With respect to the Niles Property, however, Wolf did not give Gambino this option. Rather, Koonce was given this option.

35. Judge Arnold found that Wolf had been involved with a scheme to defraud Gambino of title to the Niles Property and to one of the other properties (referred to as the "Kedzie" property). Judge Arnold found that, "In sum, Mr. Wolf was actively involved with all the transactions that resulted in WW Funding, LLC obtaining title to the Niles and Kedzie properties. That he was involved with Koonce in these transactions is a significant indication of malice."

36. Judge Arnold also noted that Wolf testified at trial inconsistent with his deposition.

37. Judge Arnold also found that, "It was obvious from the testimony of Mr. Wolf that he used WW Funding, LLC to complete the transactions he had created and to be the title holder for the Niles and Kezie properties. The slanders of title were thus the acts of WW Funding, LLC as well as they were Mr. Wolf's acts . . . ."

38. In addition to ruling in Gambino and North Star's favor in their action to quiet title, Judge Arnold also ruled in their favor on their slander of title claims. Judge Arnold imposed

damages against the defendants, including punitive damages totaling $175,000 against both Wolf and his company, WW Funding.

### E. The Illinois Appellate Court Upholds the Trial Court's Findings.

39. Wolf and other defendants appealed Judge Arnold's decision to the Appellate Court of Illinois. On December 11, 2009, the Appellate Court issued a 49-page written opinion. A copy of this opinion is attached as Exhibit D hereto. ATG expressly adopts and incorporates Exhibit D.

40. The Appellate Court upheld Judge Arnold's findings in all material respects.

41. More specifically, the Appellate Court noted that, "The trial court found that Wolf was involved with Sal's defrauding of Gambino from the beginning . . . . Sal first approached Wolf with regard to the Niles Property. Wolf referred the loan to Zippershtein, who made a $200,000 loan on the Niles Property. Wolf earned a $5,250 commitment fee from that loan. His son Adam earned a $4,000 commitment fee. Both Fritzshall and Sal testified that Wolf was present for the first closing related to the Niles Property. Wolf denied being present."

42. The Appellate Court also noted that, "As to the Niles Property, after Zippershtein filed the foreclosure suit, WW Funding purchased the property, obtaining $445,000 in financing from Plaza Bank. WW Funding held $135,171.38 from closing. Upon WW Funding's taking title to [the Niles Property], options to purchase were granted to Koonce."

43. The Appellate Court further noted that, "The trial court 'flatly disbelieved' Wolf's testimony that he personally met with Gambino and that Gambino approved the aforementioned transactions."

44.     The Appellate Court upheld the trial court's judgment in favor of Gambino and North Star, including the trial court's judgment of $175,000 in punitive damages against Wolf.

45.     At the time that WW Funding purchased the Niles Property in or around June 2004, and throughout the pendency of the Gambino Litigation, WW Funding and Wolf knew that WW Funding did not have valid title to the Niles Property.

**F.     ATG's Damages.**

46.     As a result of ATG having issued its title insurance policies, ATG had to provide WW Funding and Plaza Bank with a defense in the Litigation. ATG incurred $260,424.26 in attorneys' fees and related costs and expenses doing so.

47.     Since the Litigation invalidated Plaza Bank's mortgage, ATG also had to pay Plaza Bank $422,207.54, which was the unpaid amount due under Plaza Bank's now-invalid mortgage on the Niles Property.

## COUNT I
## OBJECTION TO DISCHARGE UNDER § 523(a)(2)(A)

48.     ATG repeats, realleges and incorporates herein paragraphs 1 through 47.

49.     When Wolf, on behalf of WW Funding, requested that ATG issue its policies of title insurance, Wolf did not disclose the following material facts to ATG: (a) WW Funding was, in actuality, not obtaining valid title to the Niles Property; (b) Wolf was participating in a scheme to deprive Gambino of his interest in the Niles Property; and (c) Wolf, through WW Funding, was getting more than $135,000 from the purchase of the Niles Property through the Plaza Bank loan.

50.     When WW Funding and Plaza Bank tendered their defense of the Gambino Litigation to ATG, Wolf on behalf of WW Funding did not disclose to ATG that WW Funding

-10-

did not, in actuality, have valid title to the Niles Property, that Wolf had participated in a scheme to deprive Gambino of title to the Niles Property, and that WW Funding had received more than $135,000 from the Plaza Bank loan.

51. Had Wolf informed ATG of the facts set forth in paragraphs 49 and 50, ATG would not have issued its policies of title insurance, ATG would not have defended WW Funding and Plaza Bank in the Litigation and incurred legal fees and costs doing so, and ATG would not have had to pay the remaining balance due on Plaza Bank's mortgage.

52. Wolf was under a legal duty to disclose to ATG the facts set forth in paragraphs 49 and 50.

53. Wolf intended to deceive and defraud ATG when he failed to inform ATG of the facts set forth in paragraphs 49 and 50.

54. ATG justifiably relied on Wolf to disclose the facts set forth in paragraphs 49 and 50 when ATG issued its policies of title insurance and when defending WW Funding and Plaza Bank in the Litigation.

55. Wolf's actions and omissions alleged herein constitute false pretenses, false misrepresentations and actual fraud with respect to ATG.

56. As a result of Wolf's actions and omissions, Wolf is indebted to ATG in the amount of $682,631.80, and this sum is not dischargeable under § 523(a)(2)(A) of the Bankruptcy Code.

### COUNT II
### OBJECTION TO DISCHARGE UNDER § 523(a)(6)

57. ATG repeats, realleges and incorporates herein paragraphs 1 through 47.

58. Wolf intended ATG to issue its policies of title insurance and intended ATG to defend his company (WW Funding) and Plaza Bank in the Litigation, fully knowing that WW Funding had not obtained and did not have valid title to the Niles Property. Wolf needed ATG to issue its policies of title insurance, or Plaza Bank would not have financed his company's purported purchase of the Niles Property, and WW Funding would not have received $135,000 from the loan proceeds.

59. Wolf knew that if Gambino and/or North Star ever asserted a claim against WW Funding or Plaza Bank to quiet title to the Niles Property, then ATG would be under a duty to defend and indemnify WW Funding and Plaza Bank, as a result of having issued its policies of title insurance.

60. Wolf knew that it was substantially certain that, at some point, Gambino and/or North Star would realize that the Niles Property had been conveyed without their agreement and that Gambino and/or North Star would bring suit to quiet title.

61. Wolf intended not only to cause ATG to issue its policies of title insurance, but he intended that ATG defend and indemnify WW Funding and Plaza Bank, knowing this would cause damage to ATG. Wolf thereby intended to damage ATG and/or knew that damage to ATG was substantially certain to result from his actions and omissions.

62. Wolf's conduct and omissions were willful and malicious.

63. As a result of Wolf's actions and omissions, Wolf is indebted to ATG in the amount of $682,631.80, and this sum is not dischargeable under § 523(a)(6) of the Bankruptcy Code.

WHEREFORE, the plaintiff and creditor, Attorneys' Title Guaranty Fund, Inc., respectfully prays that this Honorable Court enter an order pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523 (a)(6) finding that:

    a.    defendant and debtor Stephen Wolf has a debt in the amount of $682,631.80 to Attorneys' Title Guaranty Fund, Inc. and that this debt is valid and exists;

    b.    this debt is non-dischargeable; and

    c.    Attorneys' Title Guaranty Fund, Inc. is entitled to such other relief as the Court deems necessary and just.

                      ATTORNEYS' TITLE GUARANTY FUND, INC.

                      /s/ John A. Dienner
                          One of Its Attorneys.

Steven J. Rotunno (3122500)
srotunno@kftrlaw.com
John A. Dienner (0633933)
jdienner@kftrlaw.com
Barry P. Kaltenbach (6270034)
bkaltenbach@kftrlaw.com
Kubasiak, Fylstra, Thorpe & Rotunno, P.C.
Two First National Plaza, 29th Floor
20 South Clark Street
Chicago, Illinois 60603
(312) 630-9600
(312) 630-7939 (facsimile)

## CERTIFICATE OF SERVICE

      John A. Dienner, an attorney, states that I caused copies of the **SECOND AMENDED COMPLAINT SEEKING A DETERMINATION OF THE DISCHARGEABILITY OF A DEBT**, to be filed with the Clerk of the United States Bankruptcy Court, using the ECF filing system, which will send notification of such filings to all counsel of record electronically on October 20, 2011.

                                                    By: <u>John A. Dienner</u>