## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| STEPHEN A. WOLF, | ) | Case No. 11- B- 00701 |
| | ) | |
| Debtor. | ) | Hon. Timothy A. Barnes |
| ------------------------------------------------- | ) | Courtroom 613 |
| ATTORNEYS' TITLE GUARANTY FUND, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 11-A-00966 |
| | ) | |
| STEPHEN A. WOLF, | ) | |
| | ) | |
| Defendant. | ) | |

### ATG'S STATEMENT OF MATERIAL FACTS
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff, Attorneys' Title Guaranty Fund, Inc. ("ATG"), a creditor of Debtor, Stephen A. Wolf ("Wolf"), in accordance with Federal Rule of Bankruptcy Procedure 705 and Local Rule 7056-1, submits the following Statement of Material Facts in Support of its Motion for Summary Judgment:

**A.    The Parties.**

1.    ATG is an Illinois corporation.   (See ATG's Third Amended Complaint Seeking a Determination of the Dischargeability of Debt ("Third Amended Complaint"), Wolf's Answer to Counts I and II of ATG's Third Amended Complaint, and Wolf's Answer to Counts III and IV of ATG's Third Amended Complaint, attached as Exhibits 1, 2 and 3 hereto, at ¶1.)[1]   ATG is in

---

[1] Wolf responded to ATG's Third Amended Complaint by moving to dismiss Counts I and II, but answering Counts III and IV.   After this Court denied his motion to dismiss, he then answered Counts I and II.   Exhibit 2 is his Answer

the title insurance business, and it regularly issues title insurance policies to purchasers of real estate and their mortgage lenders. (See Affidavit of Michael K. Brandt, attached as Exhibit 4 hereto, at ¶2.)

2. Wolf is an individual domiciled in Northbrook, Illinois. (See Exhibits 1, 2 and 3 at ¶3.)

3. For the past 30 to 35 years, Wolf's primary business has been buying and selling real estate. Wolf often uses a single-purpose entity, such as a limited liability company, for his business transactions. Wolf has been involved in the purchase or sale of over 100 properties. During his career, companies in which he has had an interest have been involved in real estate litigation, and he personally has been a party to other, non-real estate related litigation. (Stipulated.)[2]

**B.    ATG's Third Amended Complaint, Jurisdiction and Venue.**

4. On January 10, 2011, Wolf commenced Case No. 11-00701 by filing a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. (See Exhibits 1, 2 and 3 at ¶4.)

5. On December 16, 2011, ATG filed its Third Amended Complaint. (See generally Exhibit 1.)

6. In Count I of its Third Amended Complaint, ATG alleges that Wolf is indebted to ATG in the total amount of $682,631.80 and that such debt is non-dischargeable under Section 523(a)(2)(A) of the Bankruptcy Code. In Count II, ATG alleges that Wolf's debt is non-dischargeable under Section 523(a)(6). (See Exhibit 1 at Counts I and II.)

---

to Counts I and II, and Exhibit 3 is his Answer to Counts III and IV.
2  ATG and Wolf have privately stipulated to certain facts.

7. In Counts III and IV of its Third Amended Complaint, ATG alleges that Wolf is indebted to Plaza Bank through a promissory note, guaranty and mortgage (all as hereinafter more particularly described), and that ATG is the assignee of such instruments. (See Exhibit 1 at Counts III and IV.) A copy of this assignment is attached as Exhibit 5 hereto. A copy is also attached to ATG's Third Amended Complaint as Exhibit 8 thereto. (Stipulated.)

8. In Count III, ATG alleges that Wolf's debt to Plaza Bank is non-dischargeable under Section 523(a)(2)(A). In Count IV, ATG alleges that Wolf's debt is non-dischargeable under Section 523(a)(6).

9. This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. § 1337(b) and § 157(b)(2)(I) and applicable rules of this Court and the United States District Court for the Northern District of Illinois. (See Exhibits 1, 2 and 3 at ¶6.)

10. Venue is proper in this District because Wolf is domiciled in this District and filed his voluntary petition in this District. (See Exhibits 1, 2 and 3 at ¶7.)

    **C.**     **The Underlying Gambino Litigation.**

11. In 2002, an individual named Joseph Gambino ("Gambino") owned the beneficial interest of a land trust, which owned certain real property located at 7460 N. Milwaukee Ave., Niles, Illinois (the "Niles Property"). North Star Trust Company ("North Star") was the land trustee of the Niles Property. (Stipulated.)

12. On March 9, 2005, Gambino and North Star, as trustee, filed a lawsuit in the Circuit Court of Cook County, Illinois, Case No. 05 CH 04303 (the "Gambino Litigation"). The plaintiffs in the Gambino Litigation filed a series of amended pleadings, culminating in a

Corrected Second Amended Complaint. A copy of the Corrected Second Amended Complaint in the Gambino Litigation is attached as Exhibit 6 hereto. (Stipulated.)[3]

13. The defendants in the Gambino Litigation included Wolf, and an entity known as W.W. Funding, LLC ("WW Funding"). (See Exhibit 6.)

14. The Stephen Wolf who is the debtor in this adversary proceeding is the same Stephen Wolf who was a defendant in the Gambino Litigation. (Stipulated.)

15. WW Funding was an entity with which Wolf was affiliated. (See the Deposition of Stephen Wolf, attached as Exhibit 7 hereto, at 25:14-14; 29:2-30:12.) (Wolf's relationship with WW Funding is discussed in more detail below.)

16. In the Corrected Second Amended Complaint, Gambino and North Star alleged that a North Star land trust held title to three properties, and Gambino was the beneficiary of each land trust. The three properties were the Niles Property, and two other properties known as the "Kedzie Property" and the "Lavergne Property." (Exhibit 6 at ¶¶1-2.)

17. In the Corrected Second Amended Complaint, Gambino and North Star alleged generally that the defendants worked together using forged documents to undertake a series of fraudulent transactions that resulted in the three properties purportedly being taken out of trust and then subsequently conveyed from Gambino to certain of the defendants. (See generally Exhibit 6.)[4]

---

3 As a result of various amendments and the passing of Joseph Gambino during the Gambino Litigation, the Gambino Litigation eventually was styled as *Joseph M. Gambino, Independent Administrator of the Estate of Joseph J. Gambino; and North Stat Trust Company as Trustee U/T/A 13534, 23994 and 23895 v. WW Funding, LLC; 21st Century Financial Planners, Inc.; Boulevard Mortgage Corporation; Dennis D. Koonce; Enzo DiBenedetto; Salvatore DiBenedetto; Title America, Inc.; Washington Mutual Bank; Stephen Wolf; Ross Waxman; and Plaza Bank*. (Stipulated.)

4 As further set forth in this Statement of Material Facts, there were two transactions involving the Niles Property: the Niles I transaction in December 2002; and the Niles II transaction in June 2004. ATG and Plaza Bank provided title insurance and funding, respectively, for the Niles II transaction. Transaction involving the Kedzie Property and

18. With respect to the Niles Property, in Count III of the Corrected Second Amended Complaint, Gambino and North Star alleged that in the fall of 2003, a man named Reuben Zippershtein ("Zippershtein") approached Gambino and claimed that he had a mortgage on the Niles Property, and that Gambino was in default of that mortgage. Gambino denied that the Niles Property was encumbered with a mortgage. (Exhibit 6 at ¶31.)

19. Gambino and North Star also alleged that Zippershtein contacted Gambino again in December 2003 and demanded repayment of a $200,000 mortgage loan; that Gambino again denied having entered into the loan; and that Zippershtein filed a mortgage foreclosure suit in January 2004, only to later voluntarily dismiss it in July 2004 and release his mortgage. (Exhibit 6 at ¶¶32-33.)

20. Gambino and North Star further alleged that Gambino later came to learn that certain defendants, including Wolf, WW Funding, Salvatore DiBenedetto and Dennis Koonce had acted together to record a series of forged deeds and mortgages that purported to transfer title to the Niles Property away from Gambino and North Star, thereby clouding title to the Niles Property. (Exhibit 6 at ¶34.)

21. Gambino and North Star alleged that these forged documents included: (a) a forged trustee's deed recorded on December 26, 2002, purportedly conveying title from North Star to Gambino; (b) a forged commercial mortgage recorded on January 21, 2003, in favor of Zippershtein and purportedly documenting a $200,000 loan; (c) a forged warranty deed recorded on July 8, 2004, purportedly conveying title from Gambino to WW Funding; and (d) a

---

Lavergne Property were also at issue in the Gambino Litigation, but they are not particularly relevant to this adversary proceeding. They are mentioned for reference only because the Circuit Court and Appellate Court opinions discuss all three properties and the multiple transactions involving each.

commercial mortgage recorded July 8, 2004, by which WW Funding purportedly granted Plaza Bank, its mortgage lender, a mortgage on the Niles Property. (Exhibit 6 at ¶34.)

22. In Count IV of the Corrected Second Amended Complaint, Gambino and North Star allege that Wolf, WW Funding and other defendants slandered title to the Niles Property through their act of recording the above documents. (Exhibit 6 at ¶40.)

23. Gambino and North Star also alleged that Wolf, WW Funding and the other defendants undertook false, fraudulent, willful and malicious actions, warranting punitive damages. (Exhibit 6 at ¶¶40, 43-44.)

### D. The Gambino Trial.

24. The Gambino Litigation went to a bench trial in the fall of 2007. The trial lasted approximately two weeks. (Stipulated.)

25. On November 30, 2007, Judge Nancy J. Arnold of the Circuit Court of Cook County, Illinois issued a written Findings of Fact and Judgment after Trial. A copy is attached as Exhibit 8 hereto. A copy is also attached to ATG's Third Amended Complaint as Exhibit 6 thereto. (Stipulated.)

26. On May 2, 2008, Judge Arnold issued a further written Memorandum Order on Slander of Title Counts. A copy is attached as Exhibit 9 hereto.

27. On Count III of the Corrected Second Amended Complaint, which sought to quiet title to the Niles Property, Judge Arnold entered judgment in favor of Gambino[5] and North Star, and against WW Funding and Plaza Bank. Judge Arnold held that "[a]ll purported instruments

---

[5] By this point, Gambino's passing had led to Joseph M. Gambino, Independent Administrator of the Estate of Joseph J. Gambino, substituting as plaintiff for Gambino. ATG will continue to refer to the estate as "Gambino."

of title through which WW Funding . . . and Plaza Bank claim any interest in [the Niles Property] are hereby declared void."   (See Exhibit 8 at 20-21.)

28.   With respect to the slander of title alleged in Count IV of the Corrected Second Amended Complaint, Judge Arnold found that Wolf slandered title to the Niles Property and acted with malice.   (Exhibit 8 at 13-15.)   Judge Arnold determined that punitive damages were appropriate.   (Exhibit 8 at 18.)

29.   Judge Arnold also found that Wolf had created and used WW Funding to be his title holder to the Niles Property, and his actions were the actions of WW Funding. Accordingly, Judge Arnold found that WW Funding had also slandered title to the Niles Property.   Because Wolf had acted with malice, WW Funding was found to have acted with malice, and punitive damages against WW Funding were also appropriate.   (Exhibit 8 at 16, 18.)

30.   On Count IV of the Corrected Second Amended Complaint, Judge Arnold then entered judgment in favor of Gambino and North Star, and against Wolf and WW Funding, jointly and severally, for compensatory damages and $175,000 in punitive damages.   (Exhibit 9 at 7.)

### E.   The Gambino Appeal.

31.   Wolf and WW Funding appealed Judge Arnold's findings to the Appellate Court of Illinois.   (Stipulated.)

32.   On December 11, 2009, the Appellate Court issued its opinion.   A copy is attached as Exhibit 10 hereto.   A copy is also attached to ATG's Third Amended Complaint as Exhibit 7 thereto.   (Stipulated.)

33. Wolf and WW Funding declined to pursue their appeal of the judgment against them on the quiet title action. They appealed only the findings against them with respect to the slander of title claim, and the assessment of damages. (See Exhibit 10 at 19 n.4, 33, and generally 34-41.)

34. The Appellate Court affirmed the judgment of the Circuit Court of Cook County, Illinois, in its entirety. (Exhibit 10 at 49.)

### F. Additional Information Regarding WW Funding.

35. WW Funding had no employees, and Wolf and Ross Waxman jointly made business decisions on its behalf. With respect to the entity's name, one "W" stands for Wolf, the other "W" stands for Waxman. (Stipulated.)[6]

36. WW Funding had only two members: Ross Waxman, and an entity called Wolf Real Estate Partnership, L.P. ("Wolf Real Estate Partnership"). Wolf Real Estate Partnership was a family-owned partnership. (Stipulated.)

37. Other than the Niles II transaction (described in more detail below), WW Funding did no other business. (Stipulation.)

38. When Marc Smith (an attorney, whose role is described in more detail below) performed legal services for WW Funding, he took his instructions from Stephen Wolf. (See the Deposition of Marc Smith, attached as Exhibit 11 hereto, at 37:5-22.)

### G. Additional Information on the "Niles I" Transaction in December 2002.

39. In the summer of 2002, Gambino was in debt. Gambino and his nephew, Salvatore DiBenedetto, discussed the possibility of using the Niles Property and the other two

---

6 Ross Waxman was a defendant in the Gambino litigation, but was subsequently dismissed.

properties (the Kedzie Property and the Lavergne Property) as collateral to obtain a loan. (Exhibit 10 at 19-20.)

40. Salvatore DiBenedetto met with Wolf and showed Wolf a list of the properties that Gambino owned and the debt that was on each property, if any. (Exhibit 8 at 13; Exhibit 10 at 20.) Wolf then spoke with his associated and business partner, Zippershtein. (Exhibit 10 at 20; Exhibit 7 at 20:1-21:4.)

41. In December 2002, the first of two transactions relevant to this adversary proceeding occurred with respect to the Niles Property (referred to as the "Niles I" transaction). (Stipulated.)

42. The Niles I transaction was structured such that, purportedly, Zippershtein would loan $200,000 to Gambino for 1 year, Gambino would take title to the Niles Property out of trust and hold it personally, and then Gambino would grant a mortgage in the Niles Property to Zippershtein to secure the loan. (Exhibit 10 at 20-21; Exhibit 8 at 5-6.)

43. Wolf was present for the closing of the Niles I transaction, even though it was Zippershtein who was purportedly making the loan. (Exhibit 8 at 13; Exhibit 10 at 20.)

44. Disbursements were made as a result of the Niles I transaction. Wolf received a commitment fee of $5,250, his son received a commitment fee of $4,000, and Zippershtein received a commitment fee of $15,750. A mortgage escrow was created with $33,000, enough to cover 11 months' worth of mortgage payments on a 12-month loan. Salvatore DiBenedetto received $25,000 directly from the closing. (Exhibit 10 at 20-21.)

45. For reference, the HUD-1 from the Niles I transaction is attached as Exhibit 12 hereto.

**H.     Additional Information on the "Niles II" Transaction in June 2004.**

46.     In June 2004, the second transaction relevant to this adversary proceeding occurred with respect to the Niles Property (the "Niles II" transaction).   (Stipulated.)

47.     The Niles II transaction was structured such that WW Funding would borrow $445,000 from Plaza Bank, pay off the Zippershtein mortgage, purchase the Niles Property, and grant Plaza Bank a mortgage on the Niles Property to secure its loan.   Also, Dennis Koonce (not Gambino) was given an option to repurchase the Niles Property for $230,000.   (Exhibit 10 at 24, 43.)

48.     To document the Plaza Bank loan, WW Funding signed, among other documents, a $445,000 promissory note payable to Plaza Bank and dated June 18, 2004.   On June 18, 2007, WW Funding signed a renewal of the original note (the "Note").   A copy of the renewed Note is attached as Exhibit 13 hereto.   A copy is also attached to ATG's Third Amended Complaint as its Exhibit 1.   Wolf signed the Note on behalf of Wolf Real Estate Partnership, one of the two members of WW Funding.   Ross Waxman also signed the Note as the other member of WW Funding.   (Stipulated.)

49.     Wolf also signed a commercial guaranty in favor of Plaza Bank (the "Guaranty"). A copy of this Guaranty is attached as Exhibit 14 hereto.   A copy is also attached to ATG's Third Amended Complaint as its Exhibit 2.   (Stipulated.)

50.     To secure the Plaza Bank loan, WW Funding gave Plaza Bank a mortgage in the Niles Property as documented by the mortgage attached as Exhibit 15 hereto.   A copy is also attached to ATG's Third Amended Complaint as its Exhibit 3 (the "Mortgage").   Wolf did not personally sign the Mortgage, but an individual named Marc Smith signed it on his behalf. (Stipulated.)   Marc Smith had Wolf's authority to sign the Mortgage.   (Exhibit 7 at 119:7-19.)

51. Marc Smith was an attorney who had been performing legal services for Stephen Wolf and his affiliated companies for several years prior to the Niles II transaction. (Stipulated.) As of 2004, Marc Smith had been licensed to practice law for approximately eighteen years. (Exhibit 11 at 25:3-9.)

52. The Mortgage was executed by Marc Smith, on behalf of Wolf, as follows: "Stephen A. Wolf, General Partner of Wolf Real Estate Partnership, L.P." (See Exhibit 15).

53. Wolf knew that if he had not signed the Note, Guaranty and Mortgage on behalf of WW Funding, Plaza Bank would not make the loan to WW Funding. He understood they were important documents. (Exhibit 7 at 119:22-120:18.)

54. Pursuant to Wolf's request, ATG issued an Owner Title Insurance Policy to WW Funding for the Niles II transaction. A copy is attached hereto as Exhibit 16. A copy is also attached to ATG's Third Amended Complaint as its Exhibit 5. (Stipulated.)

55. ATG also issued a Mortgagee Title Insurance Policy to Plaza Bank for the Niles II transaction. A copy is attached hereto as Exhibit 17. A copy is also attached to ATG's Third Amended Complaint as its Exhibit 4. (Stipulated.)

56. Wolf knew that if Gambino and/or North Star ever asserted a claim against WW Funding or Plaza Bank to quiet title to the Niles Property, then ATG would be under a duty to defend and indemnify WW Funding and Plaza Bank, as a result of having issued the title insurance policies. (Exhibits 1 and 2 at ¶59.)

57. At the closing of the Niles II transaction, where WW Funding purportedly purchased the Niles Property with funding from Plaza Bank, disbursements were made. Zippershtein received $231,680.08 (purportedly to pay off his mortgage loan from the Niles I transaction). Wolf's son received a commitment fee of $6,675. Some taxes and closing costs

were paid, and $45,000 was put into escrow to remove underground storage tanks at the Niles Property.  WW Funding, the purchaser of the Niles Property, pocketed $135,171.38.  Joseph Gambino, the seller, received nothing.  (Exhibit 10 at 24-25, 43.)

58.  For reference, the HUD-1 from the Niles II transaction is attached as Exhibit 18 hereto.  Marc Smith signed the document on Wolf's behalf, with Wolf's authority.  Other than Marc Smith being erroneously listed as the seller's attorney (when he was actually the buyer's attorney), the document is accurate.  (Stipulated.)

### I. The Specific Findings Made By the Circuit and Appellate Courts.

59.  With respect to the action to quiet title, Gambino and North Star's "proof was overwhelming" that the deeds conveying the properties to the defendants (including the Niles Property to WW Funding) were forged.  Gambino and North Star proved forgery by clear and convincing evidence.  (Exhibit 8 at 5-7.)  The fact that the deeds were forged "illustrat[ed] an intent to defraud."  (Exhibit 10 at 36.)

60.  Wolf was involved with Salvatore DiBenedetto's "defrauding of Gambino from the beginning of the events leading to trial."  (Exhibit 10 at 43.)  The closing documents for the Niles I transaction "are direct evidence of fraud.  The Niles Property alone had $25,000 in commitment fees distributed to the Wolfs and Zippershtein; a mortgage escrow of $33,000 which is unusual; a $5,000 appraisal fee; and a payment to [Salvatore DiBenedetto] of $25,000 that is questionable on its face."  (Exhibit 10 at 46.)

61.  With respect to the action for slander of title, Wolf acted with malice in slandering title to the Niles Property.  Wolf was involved with the property transactions from the outset.  He met with Salvatore DiBenedetto to review a list of Gambino's properties and

their debt load.   Wolf received a payment from the Niles I closing.   Wolf personally attended the Niles I closing, although Zippershtein and not Wolf was the lender.   (Exhibit 8 at 13-15.)

62.   Wolf testified that he did not know that the warranty deed delivering title from Gambino to WW Funding was forged, because he had met with Gambino to discuss the transaction.   Judge Arnold "flatly disbelieve[d]" this testimony.   (Exhibit 10 at 43, Exhibit 8 at 14.)

63.   The Circuit Court also found that even if Wolf had met with Gambino, this should have actually alerted Wolf that something was amiss.   All of the title documents for the closings that purportedly bore Gambino's signature were being delivered by Salvatore DiBenedetto, a non-attorney, purporting to represent Gambino.   The fact that a non-attorney was "standing in" for an owner "should have put a reasonable person on notice."   Wolf "fabricat[ed] an account of having met with Mr. Gambino personally" to "cover up" for this.   (Exhibit 8 at 14-15.)

64.   The Circuit Court also noted that Wolf had failed to provide an adequate explanation for the structure of the Niles II transaction.   Wolf's typical structure was that he would: take title to the property as lender; use the title as collateral for a loan; take a reserve from the closing for interest, taxes and insurance; take a commitment fee; and the "borrower" was given an option to repurchase the property.   (Exhibit 8 at 15.)

65.   For the Niles II transaction, however, the Circuit Court found that "the option to purchase was given *not* to the man Mr. Wolf professed to believe was the borrower (Mr. Gambino), but to Dennis Koonce."   (Emphasis in original.)   Wolf explained he gave the option to Koonce because Salvatore DiBenedetto requested it and because Koonce was credit worthy.   (Exhibit 8 at 15.)

13

66. The Circuit Court found that "the fabrication about having actually met with Mr. Gambino, together with this unconvincing explanation as to why Koonce was given an option to purchase the property, as demonstrating, at a minimum, reckless disregard on the part of Mr. Wolf for the validity of the title documents he was handling. The court finds that Mr. Wolf acted with malice." (Exhibit 8 at 15.)

67. The Circuit Court noted that it was "astounding, really that [the defendants] would persist in expecting the court to believe their vacuous story." (Exhibit 8 at 17.)

68. The Circuit Court determined that "punitive damages are warranted here as well. There was fraud and malice on the part of the defendants here." (Exhibit 8 at 18.)

69. In upholding the judgment of punitive damages against Wolf and WW Funding for slander of title, "[t]he trial court found that the malice exhibited by these defendants was beyond that necessary to establish the elements of plaintiffs' slander of title claims." There was "actual malice." The "Wolf defendants participated in a number of transactions by which the subject properties were taken from plaintiffs by means of fraudulent, forged legal documents." The closing documents were "direct evidence of fraud." (Exhibit 10 at 46.)

70. The Appellate Court of Illinois also noted that the evidence demonstrated "the reprehensible nature of the defendants' conduct," and that "the Wolf defendants participated in a scheme to take plaintiffs' properties through the use of fraudulent, forged legal documents including forged deeds." The "harm here was the result of intentional malice, trickery, and deceit." (Exhibit 10 at 47-48.)

**J.     Wolf and WW Funding Received a Fair Trial.**

71.    Wolf tendered the defense of WW Funding in the Gambino Litigation to ATG under the Owner Title Insurance Policy that ATG issued for the Niles II transaction. (Stipulated.)

72.    ATG retained Victor Henderson, a partner in the firm Holland & Knight, to represent WW Funding in the Gambino Litigation.    (Stipulated.)

73.    Both Wolf and Ross Waxman were involved with WW Funding's defense in the Gambino Litigation.   Wolf did not want a judgment entered against either WW Funding, or himself personally.    (Stipulated.)

74.    Wolf was personally present at the trial every day.    (Exhibit 7 at 35:4-9.)

75.    Wolf was defended by Marc Smith in the Gambino Litigation.    (Stipulated.) Marc Smith was Wolf's personal attorney.    (Exhibit 7 at 31:19-24.)

76.    Victor Henderson and Marc Smith did the best job they could, given the circumstances.    (Exhibit 7 at 37:11-38:1.)

77.    The Gambino Litigation was probably the most significant piece of litigation that Wolf had ever been involved with.    (Exhibit 7 at 17:23-18:2.)

**K.     Wolf's Omissions with Respect to ATG.**

78.    In or around June 2004, when Wolf requested that ATG issue its title insurance policies for the Niles II transaction, he did not disclose to ATG that: (a) the deed purportedly conveying the Niles Property from North Star to Gambino (effectively taking the Niles Property out of trust) in December 2002 (as part of the Niles I transaction) had been forged; (b) the deed that would purportedly transfer the Niles Property from Gambino to WW Funding (as part of the Niles II transaction) was forged and Gambino had never agreed to transfer the Niles Property to

15

WW Funding; (c) WW Funding would not be obtaining clear and indefeasible title to the Niles Property; (d) Wolf was causing WW Funding to slander title to the Niles Property; (e) Plaza Bank was obtaining an invalid mortgage on the Niles Property; and (f) Wolf was part of a scheme to deprive Gambino of his interest in the Niles Property.   (Exhibits 1 and 2 at ¶49.)

79.     In or around September 2005, when Wolf tendered WW Funding's defense of the Gambino Litigation to ATG, he did not disclose to ATG that: (a) the allegations in Gambino's complaint were generally true; (b) the deed purportedly transferring the Niles Property from Gambino to WW Funding in June 2004 (as part of the Niles II transaction) was forged and Gambino had never agreed to transfer the Niles Property to WW Funding; (c) Wolf had caused WW Funding to slander title to the Niles Property; (d) Plaza Bank's Mortgage was invalid; (e) when Plaza Bank's loan had been obtained, Wolf had not revealed to Plaza Bank that WW Funding did not have clear and indefeasible title to the Niles Property, and that Gambino had claims he could assert against WW Funding and Wolf; and (f) Wolf was part of a scheme to deprive Gambino of his interest in the Niles Property.   (Exhibits 1 and 2 at ¶50.)

80.     Had Stephen Wolf disclosed to ATG any of the facts identified in paragraphs 78-79, ATG would not have issued an Owner Title Insurance Policy to WW Funding or a Mortgagee Title Insurance Policy to Plaza Bank.   But for the issuance of these policies, ATG would have had no obligation to defend WW Funding and Plaza Bank in the Gambino Litigation, and no obligation to indemnify Plaza Bank when the Plaza Bank Mortgage was declared void as a result thereof.   (Exhibit 4 at ¶¶4-7.)

    **L.**    **Wolf Representations with Respect to Plaza Bank.**

81.     The Guaranty that Wolf executed in connection with the Plaza Bank loan states that: "Guarantor represents and warrants to Lender that . . . (H) no litigation, claim, investigation,

administrative proceeding or similar action . . . against Guarantor is pending or threatened[.]" (Exhibit 14, "Guarantors Representations and Warranties").

82. The Guaranty also states that: "Guarantor absolutely and unconditionally guarantees . . . the performance and discharge of all Borrower's obligations under the Note and the Related Documents." (Exhibit 14, "Continuing Guaranty of Payment and Performance"). One of the "Related Documents" was the Mortgage. (Exhibit 14, "Definitions.")

83. The Mortgage that Wolf executed in connection with the Plaza Bank loan states that: "Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple . . . ." (Exhibit 15, "Warranty; Defense of Title").

84. The Mortgage also states that: "Grantor warrants . . . title to the [Niles] Property against the lawful claims of all persons." (Exhibit 15, "Warranty; Defense of Title.")

85. Plaza Bank would not have made its $445,000 loan to WW Funding if Plaza Bank had known that: (a) Gambino, the purported seller of the Niles Property, had not agreed to transfer the Niles Property to WW Funding in connection with the loan; (b) Gambino would have a claim against WW Funding and Wolf for slandering title to the Niles Property as a result of the Plaza Bank mortgage being recorded; (c) Wolf knew that WW Funding was not obtaining good and marketable title to the Niles Property in connection with the Mortgage Loan; (d) Plaza Bank's mortgage would be declared void; or (e) Wolf was engaged in a scheme to defraud Gambino out of title to the Niles Property. (See Affidavit of Joseph Marzan, attached hereto as Exhibit 19, at ¶¶2-4.)

**M.   ATG's Damages.**

86. Plaza Bank tendered its defense in the Gambino Litigation to ATG under the Mortgagee Title Insurance Policy that ATG issued for the Niles II transaction. ATG also

defended Plaza Bank through the same attorney (Victor Henderson, of Holland & Knight) that it used to defend WW Funding. (Stipulated.)

87. Pursuant to the Owner Title Insurance Policy and Mortgagee Title Insurance Policy, ATG paid $260,424.26 in attorney's fees and related costs to defend WW Funding and Plaza Bank in the Gambino Litigation. (Stipulated.)

88. Pursuant to the Mortgagee Title Insurance Policy, ATG indemnified Plaza Bank in the amount of $422,207.54. (Stipulated.) This amount was to pay Plaza Bank for the unpaid balance on its mortgage loan of $445,000. (Exhibit 4 at ¶7.)

    Respectfully submitted,

    ATTORNEYS' TITLE GUARANTY FUND, INC.

    By: /s/ Barry P. Kaltenbach
       One of Its Attorneys.

    Steven J. Rotunno (3122500)
    srotunno@kftrlaw.com
    John A. Dienner (0633933)
    jdienner@kftrlaw.com
    Barry P. Kaltenbach (6270034)
    bkaltenbach@kftrlaw.com
    Kubasiak, Fylstra, Thorpe & Rotunno, P.C.
    Two First National Plaza, 29th Floor
    20 South Clark Street
    Chicago, Illinois 60603
    (312) 630-9600
    (312) 630-7939 (facsimile)

## CERTIFICATE OF SERVICE

    Barry P. Kaltenbach, an attorney, states that I caused copies of **ATG'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** to be filed with the Clerk of the United States Bankruptcy Court, using the ECF filing system, which will send notification of such filings to all counsel of record electronically on July 8, 2013.

                                                        By:    <u>Barry P. Kaltenbach</u>