UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 11bk00701 |
| Stephen A. Wolf | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| Attorneys' Title Guaranty Fund, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Case No. 11ap00966 |
| v. | ) | |
| | ) | |
| Stephen A. Wolf | ) | Judge Timothy A. Barnes |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

TIMOTHY A. BARNES, Judge

MEMORANDUM DECISION

The matter before the court arises out of the Third Amended Complaint [Adv. Dkt. No. 53] (the "Complaint"), filed by Attorneys' Guaranty Title Fund, Inc. ("ATG") in the above-captioned adversary proceeding (the "Adversary"), seeking a determination of dischargeability of debt under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6) against the debtor Stephen A. Wolf ("Wolf" or the "Debtor").

More specifically, the Complaint asserts the following counts:

(a) Count I:  nondischargeability under 11 U.S.C. § 523(a)(2)(A) of a debt owed directly by Wolf to ATG;

(b) Count II:  nondischargeability under 11 U.S.C. § 523(a)(6) of that same debt;

(c) Count III:  nondischargeability under 11 U.S.C. § 523(a)(2)(A) of a debt owed by Wolf but assigned to ATG; and

(d) Count IV:  nondischargeability under 11 U.S.C. § 523(a)(6) of the same debt as assigned to ATG.

The matter was tried before the court in a two and one-half day trial that took place from April 14, 2014 through April 16, 2014 (the "Trial"). For the reasons set forth herein, the court holds that the debt is nondischargeable by the Debtor, and finds in favor of ATG on Counts I and III of the Complaint.

This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). A separate order will be entered pursuant to Bankruptcy Rule 9021.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the United States Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). A proceeding for determination of the dischargeability of a particular debt arises in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(I); *Birriel v. Odeh (In re Odeh)*, 431 B.R. 807, 810 (Bankr. N.D. Ill. 2010) (Wedoff, J.); *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 151 (Bankr. N.D. Ill. 2009) (Squires, J.).

None of the parties have raised the issue of whether this court has constitutional authority to enter a final judgment on all counts of the Complaints in light of the United States Supreme Court's decision in *Stern v. Marshall*, 564 U.S. ---, 131 S. Ct. 2594 (2011). This court has an independent duty to determine whether it has such authority. *Rutkowski v. Adas (In re Adas)*, 488 B.R. 358, 379 (Bankr. N.D. Ill. 2013) (Hollis, J.).

All of the counts in the Complaint are based on sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code. Section 523 is unequivocally a bankruptcy cause of action. While such actions may turn on state law, determining the scope of a debtor's discharge is a fundamental part of the bankruptcy process. *See Dietz v. Ford (In re Deitz)*, 469 B.R. 11, 20 (B.A.P. 9th Cir. 2012). As observed by one bankruptcy court, "there can be little doubt that [a bankruptcy court], as an Article I tribunal, has the constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case." *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011); *see also Dietz*, 469 B.R. at 20; *White Eagle, Inc. v. Boricich (In re Boricich)*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011) (Schmetterer, J.).

Thus, even in light of the Seventh Circuit's later opinions regarding *Stern*, *see Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013); *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 665 F.3d 906 (7th Cir. 2011),[1] the court concludes that it has constitutional authority to enter a final judgment in this Adversary.

Accordingly, final judgment is within the scope of the court's authority.

---

[1]     As noted by this Court recently, the central holding of *Ortiz* has been abrogated by the Supreme Court. *In re Woods*, No. 13bk39194, 2014 WL 4059229, at *5 (Bankr. N.D. Ill. Aug. 18, 2014) (Barnes, J.) (*citing Exec. Benefits Ins. Agency v. Arkison*, --- U.S. ---, 134 S.Ct. 2165 (2014)).

## PROCEDURAL HISTORY

In considering the relief sought by ATG, the court has considered the evidence and argument presented by the parties at the Trial, has reviewed the Complaint, the attached exhibits submitted in conjunction therewith, and has reviewed and found each of the following of particular relevance:

(1) Wolf's Answer to Plaintiff's Third Amended Complaint Seeking a Determination of the Dischargeability of a Debt [Adv. Dkt. No. 63] (the "First Answer");

(2) Wolf's Answer to Counts I and II of Plaintiff's Third Amended Complaint Seeking a Determination of the Dischargeability of a Debt [Adv. Dkt. No. 88] (the "Second Answer");[2]

(3) Amended Final Pretrial Order Governing Complaint Seeking a Determination of the Dischargeability of a Debt [Adv. Dkt. No. 143];

(4) Joint Pretrial Statement, including the attached exhibits submitted in conjunction therewith [Adv. Dkt. No. 144] (the "Joint Pretrial Stmt");

(5) ATG's Motion in Limine to Bar Evidence, Testimony or Defenses Disputing the Issues and Finds of Fact Against Wolf in the State Court Judgment [Adv. Dkt. 146];

(6) ATG's Motion in Limine to Bar Certain Testimony by Marc Smith [Adv. Dkt. 147];

(7) Order Denying ATG's Motion in Limine to Bar Evidence, Testimony or Defenses Disputing the Issues and Finds of Fact Against Wolf in the State Court Judgment [Adv. Dkt. 149];

(8) Order Denying ATG's Motion in Limine to Bar Certain Testimony by Marc Smith [Adv. Dkt. 150];

(9) ATG's Proposed Findings of Fact and Conclusions of Law [Adv. Dkt. No. 164];

(10) ATG's post-trial Supplemental Brief and Closing Statement [Adv. Dkt. No. 165];

(11) Wolf's Proposed Findings of Fact and Conclusions of Law [Adv. Dkt. No. 167]; and

(12) Wolf's post-trial Supplemental Brief and Closing Statement [Adv. Dkt. No. 168].

At the Trial, all of ATG's offered exhibits were admitted with no objection from Wolf. The exhibits offered by Wolf were admitted without objection, over the objections of ATG or upon the

---

[2]    The First Answer filed by Wolf answered only the third and fourth counts of the Complaint, as Wolf, concurrently with the filing of the First Answer, moved to dismiss the first and second counts of the Complaint. When that motion was denied, Wolf thereafter filed the Second Answer, as to the first and second counts of the Complaint only. The Court looked to the Second Answer for Wolf's answers to the first and second counts and the First Answer for Wolf's answers to the third and fourth counts.

withdrawal of objections by ATG, except for the following:  Exhibits No. 1, 2, 4-8, 10, 17-19, 21-25, 28, 29, 32, 37, 40 and 41.

The court has considered the procedural history and previous court filings in this Adversary, including:

(1)  Wolf's Motion to Dismiss Counts I and II of Plaintiff's Third Amended Complaint Seeking a Determination of the Dischargeability of a Debt and related exhibits [Adv. Dkt. No. 65];

(2)  ATG's Response to Wolf's Motion to Dismiss Counts I and II of Its Third Amended Complaint [Adv. Dkt. No. 68];

(3)  Wolf's Reply to ATG's Response to Wolf's Motion to Dismiss Counts I and II of Its Third Amended Complaint and related exhibits [Adv. Dkt. No. 73];

(4)  Order Denying Wolf's Motion to Dismiss Counts I and II of Plaintiff's Third Amended Complaint [Adv. Dkt. No. 85];

(5)  ATG's Motion for Summary Judgment and related filings [Adv. Dkt. Nos. 113, 114, and 115];

(6)  Wolf's Response to Statement of Material Facts in Support of ATG's Motion for Summary Judgment and Wolf's Additional Undisputed Facts [Adv. Dkt. No. 126];

(7)  Wolf's Response to ATG's Motion for Summary Judgment and related filings [Adv. Dkt. No. 128];

(8)  ATG's Reply Brief in Support of its Motion for Summary Judgment [Adv. Dkt. No. 130];

(9)  ATG's Reply to Wolf's Statement of Additional Undisputed Facts [Adv. Dkt. No. 131];

(10)  Order Denying ATG's Motion for Summary Judgment [Adv. Dkt. No. 135];

(11)  ATG's Motion to Alter or Amend This Court's Order of October 2, 2013 (Order Denying ATG's Motion for Summary Judgment) [Adv. Dkt. No. 138]; and

(12)  Order Denying ATG's Motion to Alter or Amend Judgment/Order (Order Denying ATG's Motion for Summary Judgment) [Adv. Dkt. No. 139].

Though the foregoing items do not constitute an exhaustive list of the filings in the Adversary, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (authorizing a bankruptcy court to take judicial notice of its own docket).

## BACKGROUND

This case arises as the result of an apparent scheme in which the defendant Wolf, W.W. Funding, Inc. ("W.W. Funding") and other parties participated in order to take three parcels of real

estate from Joseph J. Gambino ("<u>Gambino</u>"), as beneficiary of three separate land trusts that held title to the three subject properties (the "<u>Trusts</u>"), through the use of fraudulent, forged legal documents including forged deeds. The subject properties are located at 7460 North Milwaukee Avenue in Niles, Illinois (the "<u>Niles Property</u>"), 2738-40 North Kedzie Avenue in Chicago, Illinois (the "<u>Kedzie Property</u>"), and 3619 North Lavergne Avenue in Chicago, Illinois (the "<u>Lavergne Property</u>", and together with the Niles Property and the Kedzie Property, the "<u>Properties</u>").

In conjunction with the transactions by which the Properties were taken, the plaintiff ATG issued an owner title insurance policy to Wolf and W.W. Funding and a mortgagee title insurance policy to Plaza Bank, which made the loan to W.W. Funding to purchase the Niles Property.

Gambino and North Star Trust Company ("<u>North Star</u>"), the trustee under the Trusts, together commenced a state court action in the Circuit Court of Cook County, Illinois (the "<u>State Court</u>"), Case No. 05 CH 04303 (the "<u>Gambino Litigation</u>") against Wolf, W.W. Funding and others to quiet title to the Properties and to recover damages for slander of title on each Property. Under the owner title insurance policy, ATG was obligated to and did pay the costs to defend Wolf and W.W. Funding in the Gambino Litigation.

After a two-week bench trial in 2007, the State Court found in favor of the Gambino and North Star on all counts of their complaint and declared that title to the Properties to be vested in North Star under the trust agreements. All purported inconsistent instruments of title and any clouds on title to the subject properties, including mortgage liens were declared void. The State Court also awarded Gambino and North Star compensatory and punitive damages against the defendants, including Wolf.

The Illinois Appellate Court affirmed the State Court's findings and judgment in all respects and, as a result, ATG was obligated under the mortgagee title policy to pay off the balance of the loan owed by W.W. Funding to Plaza Bank. Upon ATG's having done so, that debt was assigned to ATG.

On January 10, 2011, Wolf filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, Case No. 11bk00701, and on April 25, 2011, ATG commenced the Adversary. ATG seeks, based in part on the State Court's findings, a determination that the loan made by Plaza Bank and other amounts paid by ATG are not dischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code because the debt was procured through actual fraud, false representation and false pretenses, as well as section 523(a)(6) of the Bankruptcy Code, because the debt resulted from the willful and malicious action of Wolf.

Given the foregoing, it is unsurprising that ATG sought summary judgment on the Complaint, contending that the State Court's findings conclusively established that the debt was nondischargeable under sections 523(a)(2)(A) and (a)(6) and that Wolf was precluded from relitigating those issues.

While Wolf is clearly precluded from relitigating the issues decided by the State Court in the Gambino Litigation, it was the determination of this court on summary judgment that the State Court stopped short of making the necessary findings so that this court, as a matter of preclusion, would grant summary judgment. In particular, the State Court failed to address Wolf's intent in its determinations. Further, as discussed more fully below, such intent was not a necessary element of

the State Court's holding. As a result, this court denied summary judgment and the case was set for trial on the issue of Wolf's intent.

However, the State Court's handling of intent and the preclusive effect of the earlier rulings have been further developed by the parties. In so doing, the parties have raised an issue of first impression regarding the scope of preclusion. That will be discussed in further detail below, and the question of intent will be revisited.

## EVIDENTIARY RULINGS

At the Trial on this matter, the majority of the parties' evidentiary objections were determined. ATG, however, raised two hearsay objections with respect to the testimony of Wolf that were not resolved. These objections raised the question of whether Wolf was able to testify to conversations between Wolf and Gambino due to the Illinois Dead Man's Act, 735 ILCS 5/8-201, and whether ATG had "opened the door" for Wolf to testify about an alleged meeting he had with Gambino. Tr. 623-26, Apr. 14, 2014. The court took the objections under advisement and asked the parties to address them in their respective post trial submissions.

In ATG's post-trial Supplemental Brief and Closing Statement, ATG conceded that the Illinois Dead Man's Act did not apply, Pl.'s Supp. Br. 3, and thus the court finds that the objection regarding the Illinois Dead Man's Act has been withdrawn by ATG.

What remains is the question of whether ATG opened the door for Wolf to testify regarding the alleged meeting with Gambino. In ATG's Motion in Limine [Adv. Dkt. No. 146], ATG sought to prohibit testimony regarding the alleged meeting on the basis that the State Court determined that Wolf had lied about whether such a meeting had occurred. The Court denied the Motion in Limine but ATG again renewed the objection at the Trial. Tr. 626, Apr. 14, 2014.

ATG argues that it would not have inquired about the meeting but for the court's denial of the Motion in Limine. Nonetheless, ATG admits that it did inquire about such meeting. ATG "stipulate[s] … that given the Court's ruling, ATG's ensuing question did arguably open the door for the challenged testimony." Pl.'s Supp. Br. 3. ATG further states that it does not "stand on its hearsay objection," *id.*, and therefore has conceded that it opened the door for Wolf to testify regarding the alleged meeting with Gambino. The court therefore also finds that the objection involving whether ATG opened the door has been withdrawn by ATG.

## FINDINGS OF FACT[3]

From the review and consideration of the procedural background, as well as the evidence presented at the Trial (and in light of the court's evidentiary rulings above), the court determines the salient facts to be as follows, and so finds that:

---

[3]     To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. Adjudicative facts may also be found and determined later in this Memorandum Decision.

A. The Parties

    (1)  The Debtor Wolf is an individual domiciled in Oak Brook, Illinois.

    (2)  For the past 30 to 35 years, Wolf's primary business has been buying and selling real estate. Wolf often uses a single-purpose entity, such as a limited liability company, for his business transactions. Wolf has been involved in the purchase or sale of over 100 properties.

    (3)  Wolf has also owned a real estate brokerage operation and a small commercial mortgage company.

    (4)  ATG is an Illinois corporation in the title insurance business and regularly issues title insurance policies to purchasers of real estate and their mortgage lenders.

B. Gambino Niles Property

    (5)  At all relevant times, North Star was the trustee of a land trust ("Trust"), which held title to the Niles Property.[4]

    (6)  At all relevant times, Gambino was the owner of 100% of the beneficial interest in the Trust.

    (7)  On December 26, 2002, a trustee's deed, purportedly executed by North Star, conveying the Niles Property to Gambino, Document No. 0021436084 was recorded with the Cook County Recorder of Deeds.

    (8)  On January 21, 2003, a commercial mortgage purportedly executed by Gambino in favor of Reuben Zippershtein ("Zippershtein") in the amount of $200,000, Document No. 0030091259 was recorded with the Cook County Recorder of Deeds.

C. W.W. Funding

    (9)  In 2004, Wolf and Ross Waxman ("Waxman") formed W.W. Funding.

    (10)  W.W. Funding had two members – Waxman and Wolf Real Estate Partnership, L.P., a family-owned partnership.

    (11)  W.W. Funding had no employees, and Wolf and Waxman jointly made business decisions on its behalf.

    (12)  Marc Smith ("Smith") was an attorney who performed legal services for W.W. Funding at the direction of Wolf.

---

[4]    North Star also was the trustee of two other land trusts which held title to the Kedzie Property and the Lavergne Property, which are not the subject of this Adversary, but were part of the state court litigation commenced by Gambino (discussed below). Gambino was the sole beneficiary of these two trusts as well.

(13) On July 8, 2004, a second mortgage executed by W.W. Funding in favor of Plaza Bank, in the sum of $445,000, Document No. 0419005014 was recorded with the Cook County Recorder of Deeds.

D. Plaza Bank Loan

(14) On June 18, 2004, W.W. Funding executed a Promissory Note in the amount of $436,819.94 in favor of Plaza Bank as the lender (the "Note"). The Note was executed by both members of W.W. Funding, *i.e.* Waxman personally, and Wolf on behalf of Wolf Real Estate Partnership, L.P.

(15) On June 18, 2004, W.W. Funding executed a mortgage in favor of Plaza Bank, to secure the repayment of the Note (the "Mortgage"). Waxman signed the Mortgage as a member of W.W. Funding, and Wolf's attorney of fact signed the Mortgage on behalf Wolf, as general partner of Wolf Real Estate Partnership, L.P.

(16) On June 18, 2004, Wolf executed a Commercial Guaranty personally guaranteeing the repayment of the Plaza Bank loan (the "Guaranty").

(17) On June 18, 2004, W.W. Funding executed an assignment of rents to Plaza Bank (the "Rents Assignment").

(18) Pursuant to the foregoing, on the June 18, 2004, Plaza Bank advanced $445,000 (the "Plaza Bank Loan").

(19) On July 8, 2004, a warranty deed, purportedly signed by Gambino, conveying title to W.W. Funding, Document No. 0419005013 was recorded with the Cook County Recorder of Deeds (the "Niles Deed").

(20) On July 8, 2004, the Mortgage, Document No. 0419005014, was recorded with the Cook County Recorder of Deeds.

(21) Also on July 8, 2004, the Rents Assignment, Document No. 0419005015, was recorded with the Cook County Recorder of Deeds.

E. ATG Issuance of Title Policies

(22) As part of the Plaza Bank Loan transaction, Wolf requested ATG to issue a mortgagee title insurance policy in the amount of $445,000 in favor of Plaza Bank.

(23) Also, Wolf requested ATG to issue an owner title insurance policy in favor of W.W. Funding.

(24) At the time Wolf requested ATG to issue both the mortgagee and owner title insurance policies, Wolf did not advise ATG that W.W. Funding was obtaining title to the Niles Property pursuant to a forged deed and was not obtaining clear and indefeasible title to the Niles Property.

8

(25) At the time Wolf requested ATG to issue both the mortgagee and owner title insurance policies, Wolf did not advise ATG that he was participating in a fraudulent scheme with Sal DiBenedetto ("DiBenedetto") and others to deprive Gambino of the Niles Property.

(26) At the time Wolf requested ATG to issue both the mortgagee and owner title insurance policies, Wolf did not advise ATG that he was participating in a scheme that would allow him, W.W. Funding and other participants to obtain money and "fees" out of the Plaza Bank Loan.

F. Gambino State Court Litigation

(27) On March 9, 2005, Gambino and North Star, as trustee, filed the Gambino Litigation in the State Court[5] seeking to quiet title to three parcels of real estate, *i.e.* the Niles Property, the Kedzie Property, and the Lavergne Property and to recover damages for slander of title against the defendants, including Wolf, W.W. Funding and Plaza Bank.

(28) Gambino and North Star alleged that the defendants forged deeds and other fraudulent documents to obtain title to the three properties and that, through use of the forged and fraudulent documents, the defendants slandered Gambino's title to the properties and did so with malice.

(29) Defendant W.W. Funding filed counterclaims also seeking to quiet title to the parcels at issue and for unjust enrichment, fraud, intentional interference with a business relationship and slander of title.

(30) The case went to a bench trial in late October and early November of 2007.

(31) On November 30, 2007, Judge Nancy J. Arnold of the State Court issued a 21-page written Findings of Fact and Judgment after Trial (the "State Court Decision").[6] The State Court found in favor of the plaintiffs on all six counts of the plaintiffs' complaint to quiet title and for slander of title with respect to the three properties.[7]

(32) The State Court found that the evidence was overwhelming that the deeds purporting to transfer title to the three properties out of the Trust to Gambino were forged, as were the deeds conveying title from Gambino to the defendants and that title rested with Gambino.

---

[5]    Gambino suffered a heart attack during his discovery deposition in the state court litigation and died thereafter. His son, Joseph M. Gambino, was substituted as the party plaintiff as independent administrator of his father's estate, *i.e.* the Estate of Joseph J. Gambino (the "Gambino Estate").

[6]    *Gambino v. WW Funding, LLC,* No. 05CH4303 (Ill. Cir. Ct. Nov. 30, 2007) (hereinafter, "Gambino I") (The decision appears to be available on Westlaw at 2007 WL 7134774, but that reference does not generate a true and correct copy of the State Court's opinion because the reference contains many typographical errors noted by question marks. Further, the reference on Westlaw does not appear to be readily available to the public. The page references contained herein are therefore to the original copy of the opinion issued by the State Court as provided by the parties in the Joint Pretrial Statement.).

[7]    The State Court found that neither Wolf nor W.W. Funding had any involvement with respect to the contested transactions related to the Lavergne Property.

(33) The State Court also found that the defendants had slandered Gambino's title to the three properties.

(34) With respect to Wolf specifically, the State Court found as follows:

*This Defendant is not named in Count II, regarding the Lavergne property, but it is his company, WW Funding, LLC, that ultimately took title to both the Niles and Kedzie properties.*

*Mr. Wolf was involved in the Gambino property transactions from the outset. It was early on that Sal DiBenedetto showed him a list of all the properties Mr. Gambino owned, together with information as to how much debt, if any, was on each. Money was paid out to Mr. Wolf from the first closing (Niles #1). It was Zippershtein who was the lender on this loan; yet, both Zippershtein's attorney and Sal DiBenedetto testified that Wolf was present at the closing. Wolf denies this.*

*The second transaction was Kedzie #1. As to this one, Wolf asked Mr. Azran to make the loan. It was agreed in advance that in the event of a "default" by Mr. Gambino, Mr. Wolf, Mr. Zippershtein, and Mr. Azran would each take a one-third ownership interest in the property. Since the forged loan documents created a sale and lease-back transaction, so that Mr. Gambino's land trust no longer held title, Mr. Gambino would not be needed in order for Wolf, Zippershtein and Azran to accomplish this division of ownership. Mr. Gambino would simply have "failed" to exercise his option to repurchase. Mr. Wolf was paid $25,000 out of this closing. Again, the attorney for Azran testified that Wolf was at the closing, but Wolf denied this.*

*When the time for exercise of the option to "repurchase" the Kedzie property came, it was Wolf who purchased it, taking a loan from Plaza Bank to do so. Wolf had a deal in place with Koonce, to give Koonce an option to repurchase the property.*

*A similar arrangement was in place for the Niles property. Wolf had formed WW Funding, LLC by then. That entity took title and gave an option to Koonce to repurchase it.*

*In sum, Mr. Wolf was actively involved with all the transactions that resulted in WW Funding, LLC obtaining title to the Niles and Kedzie properties. That he was involved with Koonce in those transactions is a significant indication of malice.*

*Further, the court found Mr. Wolf's testimony at trial to be particularly suspect in two respects. First, Mr. Wolf testified that he, personally, had two meetings with Mr. Gambino. The court flatly disbelieves this testimony. Mr. Wolf said he asked Mr. Gambino to meet with him before the Niles #1 transaction and the Kedzie#2 transaction. This was strange testimony, inherently unbelievable and shown to be so. There were also inconsistencies in the versions Mr. Wolf gave at trial and those given at his deposition. Mr. Wolf's testimony that he had personally met with Mr. Gambino lends support to the conclusion that Mr. Wolf in fact had good reason to question his title. All title documents were being transported and delivered by someone (Sal DiBenedetto), a non-attorney, purporting to represent the owner of the property. Surely*

10

*there was reason to question these documents. It is one thing to say, as the defendants all have argued, that it is common for sellers not to appear for closings; but this was a different situation. Here we had someone other than the owner, but NOT an attorney, "standing in" for the owner. That repeated circumstance surely should have put a reasonable person on notice. The court finds that Mr. Wolf attempted to cover up for this by fabricating an account of having met with Mr. Gambino personally.*

*Second, there was no adequate explanation for a significant deviation from what Mr. Wolf himself described as his typical "structure" for loans. He described the general structure of his loan deals as follows: He, as lender, would take title; he would use the title as collateral to obtain a loan; from the closing he would take a reserve for interest, taxes and insurance; he took a "commitment fee;" and the borrower was given an option to repurchase the property by paying back the principal and costs. As to both the Niles and Kedzie properties, however, the option to purchase was given not to the man Mr. Wolf professed to believe was the borrower (Mr. Gambino), but to Dennis Koonce. When asked for an explanation, the response was not convincing. Wolf said the option was given to Koonce because Sal DiBenedetto requested it, because Koonce was "credit worthy." He also said he was willing to give the option to anyone, as long as someone paid back his "loan." The court finds the fabrication about having actually met with Mr. Gambino together with this unconvincing explanation as to why Koonce was given an option to purchase the property, as demonstrating, at a minimum, reckless disregard on the part of Mr. Wolf for the validity of the title documents he was handling. The court finds that Mr. Wolf acted with malice.*

(35) With respect to W.W. Funding specifically, the State Court found in relevant part as follows:

*It was obvious from the testimony of Mr. Wolf that he used WW Funding, LLC to complete the transactions he had created and to be the title holder for the Niles and Kedzie properties. The slanders of title were thus the acts of WW Funding, LLC as well as they were Mr. Wolf's acts, and WW Funding is, therefore, shown to have acted with malice.*

(36) The State Court determined that punitive damages were appropriate because "[t]here was fraud and malice on the part of the defendants here" and awarded $175,000 in punitive damages specifically against Wolf and W.W. Funding (jointly and severally).

(37) On May 2, 2008, the State Court issued a seven-page further Memorandum Order on Slander of Title Counts, addressing the plaintiffs request for attorneys' fees stemming from the Gambino Litigation.[8]

G. Appeal of Gambino State Court Litigation

(38) Wolf, W.W. Funding and the other defendants appealed the State Court's judgment. The Illinois Appellate Court (the "Appellate Court"), in a thorough decision, affirmed the State

---

[8]     *Gambino v. WW Funding, LLC*, No. 05CH4303, 2008 WL 7414583 (Ill. Cir. Ct. May 2, 2008) (hereinafter, "Gambino II"), *aff'd sub nom. Gambino v. Boulevard Mortg. Corp.*, 398 Ill.App.3d 21 (1st Dist. 2009).

Court's rulings. *Gambino v. Boulevard Mtg. Corp.*, 398 Ill.App.3d 21 (1st Dist. 2009) (hereinafter, "Gambino III").

(39) On appeal, Wolf and W.W. Funding did not raise any argument on the quiet title counts with respect to the State Court's finding of intent to defraud because of the established forgery.

(40) On appeal, Wolf and W.W. Funding only raised arguments with respect to the State Court's slander of title findings and its assessment of compensatory and punitive damages against them.

(41) The Appellate Court found that the State Court's finding of Wolf's and W.W. Funding's malice to support the slander of title counts was not against the manifest weight of the evidence and affirmed the State Court's findings.

(42) The Appellate Court also upheld the State Court's findings that the defendants, including Wolf and W.W. Funding, exhibited malice beyond that necessary to establish the elements of the plaintiffs' slander of title claims," and that "the harm here was the result of intentional malice, trickery, and deceit."

(43) Plaza Bank's arguments on appeal solely concerned the State Court's findings with respect to the plaintiffs' claim to quiet title to and the State Court's order voiding its mortgage lien on the Niles Property.

(44) The Appellate Court rejected Plaza Bank's argument that the State Court's findings with regard to the plaintiffs' claim to quiet title to the Niles Property were against the manifest weight of the evidence.

H. ATG Damages

(45) Pursuant to the Owner Title Insurance Policy and Mortgagee Title Insurance Policy, ATG paid $260,424.26 in attorney's fees and related costs to defend W.W. Funding and Plaza Bank in the Gambino Litigation.

(46) Pursuant to the Mortgagee Title Insurance Policy, ATG indemnified Plaza Bank in the amount of $422,207.54 on the unpaid balance on its mortgage loan of $445,000.

(47) On August 22, 2008, Plaza Bank executed an Assignment of Mortgage, assigning the Mortgage, Note, Guaranty and related Rents Assignment to ATG.

APPLICABLE LAW

A.   Nondischargeability

Counts I and III of the Complaint assert claims under section 523(a)(2)(A) of the Bankruptcy Code. Count I alleges that Wolf's actions and omissions constitute false misrepresentations, false pretenses and actual fraud with respect to ATG. Specifically, ATG alleges that Wolf, in requesting the issuance of policies of title insurance on behalf of W.W. Funding,

omitted certain material facts about the fraudulent scheme against Gambino to acquire title to the Niles Property and to induce ATG to issue such policies.

In Count III, ATG, as assignee of the Mortgage, Note and Guaranty, alleges that Wolf made false representations that he knew to be false at the time made to induce Plaza Bank to make the loan to W.W. Funding. ATG contends that Wolf specifically represented to Plaza Bank that W.W. Funding was acquiring good title and that he was not aware of any potential claims against title and that Wolf, with the intent to defraud Plaza Bank, used W.W. Funding to obtain a $445,000 loan from Plaza Bank to purchase the Niles Property, acquire title to it, and grant Plaza Bank the Mortgage on the Niles Property to secure the Plaza Bank Loan.

Counts II and IV of the Complaint assert claims under section 523(a)(6) of the Bankruptcy Code. Count II alleges that Wolf willfully and maliciously induced ATG to issue a title insurance policy by failing to disclose material facts about the fraudulent scheme against Gambino to acquire title to the Niles Property. ATG states that such action caused ATG injury when it had to defend Wolf and Plaza Bank in the state court quiet title action and pay off the mortgage loan balance to Plaza Bank. In Count IV, ATG, again as assignee, makes the same allegations of Wolf's omissions and actions as to Plaza Bank's injury when the loan was not repaid and the Mortgage was deemed void.

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Harris Trust and Savings Bank v. Gunsteen (In re Gunsteen)*, 487 B.R. 887, 899 (Bankr. N.D. Ill. 2013) (Schmetterer, J.). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991); *see also In re McFarland,* 84 F.3d 943, 946 (7th Cir. 1996). To further the policy of providing a debtor a fresh start, exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *See In re Crosswhite,* 148 F.3d 879, 881 (7th Cir. 1998); *Meyer v. Rigdon,* 36 F.3d 1375, 1385 (7th Cir. 1994).

   1.       11 U.S.C. § 523(a)(2)(A)

Section 523 enumerates specific, limited exceptions to the dischargeability of debts. Section 523(a)(2)(A) provides, in relevant part, that an individual debtor is not discharged from any debt:

   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

      (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

11 U.S.C. § 523(a)(2)(A).

First, a plaintiff must establish that the debtor owes him a debt. *See Zirkel v. Tomlinson (In re Tomlinson)*, Adv. No. 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999) (Katz, J.). Second, a plaintiff must show that the debt falls within one of the specified grounds under section 523(a)(2)(A). *Wachovia Sec., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 668 (Bankr. N.D. Ill. 2010) (Goldgar, J.). Three separate grounds for holding a debt to be nondischargeable are included under section 523(a)(2)(A): false pretenses, false representation and actual fraud. *Id.; see also Deady v. Hanson*

*(In re Hanson)*, 432 B.R. 758 (Bankr. N.D. Ill. 2010) (Squires, J.); *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001) (Goldgar, J.).

The Complaint alleges claims under section 523(a)(2)(A) based on false representations, false pretenses and actual fraud in two counts. Count I alleges that Wolf is indebted to it for $682,631.80 the debt was obtained by false statements, false pretenses and actual fraud of ATG. Count III states that Wolf obtained a loan from Plaza Bank by false statements, false pretenses and actual fraud, and ATG stands in the place of Plaza Bank as the assignee of the Mortgage, Note and Guaranty executed by Wolf and/or W.W. Funding.

a.     False Representation and False Pretenses

To except a debt from discharge under section 523(a)(2)(A) based on false pretenses or a false representation, the creditor must establish the following elements: (1) the debtor made a false representation or omission of fact; (2) which the debtor (a) knew was false or made with reckless disregard for its truth and (b) made with an intent to deceive; and (3) upon which the creditor justifiably relied. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010); *In re Bero*, 110 F.3d 462, 465 (7th Cir. 1997); *Jahelka*, 442 B.R. at 668-69. A creditor must establish all three elements to support a finding of false pretense or false representation. *Ryan*, 408 B.R. at 156; *see also Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (Squires, J.). Failure to establish any one fact is outcome determinative. *Hanson*, 432 B.R. at 771 (*citing Jairath*, 259 B.R. at 314).

Under section 523(a)(2)(A), a false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct. *See Scarpello*, 272 B.R. at 700; *In re Philopulos*, 313 B.R. 271, 281 (Bankr. N.D. Ill. 2004) (Schmetterer, J.); *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). As a spoken or written statement is not required for a false representation, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Hanson*, 432 B.R. at 772 (internal quotation omitted); *see also Scarpello*, 272 B.R. at 700. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Ryan*, 408 B.R. at 157 (*citing Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992) (Wedoff, J.)).

In contrast, "[f]alse pretenses in the context of section 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression." *Media House Productions, Inc. v. Amari (In re Amari)*, 483 B.R. 836, 846 (Bankr. N.D. Ill. 2012) (Schmetterer, J.) (*citing Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (Squires, J.)). The implication arises when a debtor, with the intent to mislead a creditor, engages in "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, ... or understanding of a transaction, in which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit to the debtor ...." *Paneras*, 195 B.R. at 406 (internal quotations omitted); *see also Amari*, 483 B.R. at 846.

A false pretense does not necessarily require overt misrepresentations. *Paneras*, 195 B.R. at 406. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a

false impression which is known by the debtor." *Id.*; *see also Hanson*, 432 B.R. at 771 (finding that a false pretense is "established or fostered willfully, knowingly and by design; it is not the result of inadvertence").

An element common to a false representation and false pretenses is reliance. The United States Supreme Court has clarified that section 523(a)(2)(A) requires only a showing of "justifiable" reliance. *See Field v. Mans*, 516 U.S. 59, 73-75 (1995); *see also Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 673 (7th Cir. 1995). Justifiable reliance is a less demanding standard than reasonable reliance and "does not mean that [the creditor's] conduct must conform to the standard of the reasonable man." *Paneras*, 195 B.R. at 406 (*quoting Field*, 516 U.S. at 71). Rather, justifiable reliance "requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda*, 599 B.R. at 717 (*quoting Field*, 516 U.S. at 71).

Whether a party justifiably relies on a misrepresentation is "determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Id.*; *see also Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (Lefkow, J.) (*quoting Field*, 516 U.S. at 70). "However, a plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods." *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (internal quotations omitted).

Several courts in this Circuit have determined that "[t]o satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *see also In re Mayer*, 51 F.3d 670, 676 (7th Cir. 1995) ("reliance means the conjunction of a material misrepresentation with causation in fact"); *Hanson*, 432 B.R. at 773. Accordingly, these courts have required the plaintiff to show that the debtor's conduct proximately caused the plaintiff's loss, thus making proximate cause an additional requirement under section 523(a)(2)(A). *See In re Luster*, 50 F. Appx. 781, 784 (7th Cir. 2002); *Tomlinson*, 1999 WL 294879, at *7; *Microtech Int'l v. Horwitz (In re Horwitz)*, 100 B.R. 395, 397-398 (Bankr. N.D. Ill. 1989) (Katz, J.).

      b.    Actual Fraud

A different analysis is used when a creditor alleges actual fraud. In order to except a debt from discharge on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud and (3) the fraud created the debt that is the subject of the discharge dispute. *Jahelka*, 442 B.R. at 669; *see also Ryan*, 408 B.R. at 157; *Scarpello*, 272 B.R. at 701; *Jairath*, 259 B.R. 308, 314. The fraud exception to the dischargeability of debts in bankruptcy does not reach constructive frauds, only actual ones. *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000); *see also Ryan*, 408 B.R. at 157.

Unlike false pretenses and false representations, "actual fraud" does not require proof of a misrepresentation or reliance. *McClellan*, 217 F.3d at 892; *see also Jahelka*, 442 B.R. at 669; *Hanson*, 432 B.R. at 771. While there is no definite rule defining fraud, "it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (internal quotations omitted).

c.    Intent

As noted above, much of this matter turns on the issue of intent. Scienter, or intent to deceive, is a required element under section 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud. *Mayer v. Spanel Int'l, Ltd. (In re Mayer)*, 51 F.3d 670, 673 (7th Cir.1995); *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006) (Schwartz, J.).

Intent to deceive is measured by the debtor's subjective intention at the time of the representations or other purportedly fraudulent conduct. *See Scarpello*, 272 B.R. at 700; *see also CFC Wireforms v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004) (Schmetterer, J.). Subsequent acts of fraud or omissions do not demonstrate that the debtor had the requisite intent at the time the representations were made. *Standard Bank & Trust Co. v. Iaquinta (In re Iaquinta)*, 95 B.R. 576, 578 (Bankr. N.D. Ill. 1989) (Squires, J.).

An intent to deceive may be established through direct evidence or inference. *Monroe*, 304 B.R. at 356 (*citing In re Sheridan*, 57 F.3d 627 (7th Cir. 1995)). Because direct proof of fraudulent intent is often unavailable, fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (Cox, J.) (internal quotations omitted); *see also Hanson*, 432 B.R. at 773. Thus, "[w]here a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Sullivan v. Glenn (In re Glenn)*, 502 B.R. 516, 532 (Bankr. N.D. Ill. 2013) (Barnes, J.) (*citing Jairath*, 259 B.R. at 315).

The court will consider below how the intent element of section 523(a)(2)(A) works, if at all, with the scienter required for the Illinois statutes in question in the Gambino Litigation.

2.    11 U.S.C. § 523(a)(6)

Section 523(a)(6) provides that an individual debtor is not discharged from any debt:

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

To state a claim under section 523(a)(6), a complaint must allege three elements:  (1) the debtor owes a debt resulting from an injury he caused to another entity or that entity's property; (2) his actions were willful; and (3) his actions were malicious. *Oakland Ridge Homeowners Ass'n v. Braverman (In re Braverman)*, 463 B.R. 115, 119 (Bankr. N.D. Ill. 2011) (Goldgar, J.).

Generally, an act of fraud is not enough to establish a cause of action under section 523(a)(6). For purposes of section 523(a)(6), "willful" means intent to cause injury, not simply intentional conduct that results in injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). "A creditor must plead . . . that the debtor actually intended to harm him and not merely that the debtor acted intentionally and he was thus harmed." *Colemichael Invs., L.L.C. v. Burke (In re Burke)*, 398 B.R. 608, 625-26 (Bankr. N.D. Ill. 2008) (Squires, J.).

Thus intent is a required element of section 523(a)(6) as well as section 523(a)(2)(A).

It is the knowledge of wrongdoing and the absence of excuse that defines malicious behavior for purposes of section 523(a)(6). *In re Young*, 428 B.R. 804, 818 (Bankr. N.D. Ind. 2010). An action in this context is considered "malicious" if it is taken "in conscious disregard of one's duties without just cause or excuse." A debtor does not have to act with ill will or a specific intent to do harm to the creditor for the conduct to be malicious. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). "The test for maliciousness under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) done without just cause and excuse." *Vozella v. Basel Van Aswegen (In re Basel Van Aswegen)*, 366 B.R. 850, 869 (Bankr. N.D. Ill. 2007) (Squires, J.) (*citing In re Paul*, 266 B.R. 686, 696 (Bankr. N.D. Ill. 2001) (Schmetterer, J.)).

That said, the debtor may be culpable under section 523(a)(6) if the debtor's act "'was substantially certain to result in injury.'" *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774-75 (7th Cir. 2013) (*quoting Bukowski v. Patel*, 266 B.R. 838, 844 (E.D. Wis. 2001)). Thus a debtor who should have know his or her actions would result in injury would be liable.

"An injury is willful within the meaning of section 523(a)(6) only if intended; if it's the result but not the *intended* result of an intentional act, the debt arising from the injury is dischargeable . . . ." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir. 2012) (internal citation omitted). Because a debtor will rarely admit to engaging in willful and malicious conduct, those requirements may be inferred by the surrounding circumstances. *Burke v. Burke (In re Burke)*, 398 B.R. 608, 626 (Bankr. N.D. Ill. 2008).

Finally, it must be noted that section 523(a)(2)(A) and section 523(a)(6) must be read independently. The Seventh Circuit has held that demonstrating act of fraud alone is not enough to establish grounds under section 523(a)(6), even if it appears on its face to do so. *Berkson v. Gulevsky (In re Gulevsky)*, 362 F.3d 961, 964 (7th Cir. 2004) ("§ 523(a)(6) cannot make all debts procured by fraud nondischargeable, because that would make superfluous § 523(a)(2), § 523(a)(4), and § 523(a)(11), all of which make different sorts of debts procured by fraud nondischargeable."). If an act of fraud is expressly covered elsewhere in section 523, section 523(a)(6) cannot be used to circumvent those requirements. *Id.*

B.   Illinois Law

The primary cause of action brought against Wolf in the Gambino Litigation was slander of title.[9]

A plaintiff asserting slander of title bears the burden of proving the following: (1) the defendants made a false and malicious publication, either oral or written; (2) that such publication disparaged the plaintiff's title to property; and (3) damages due to such publication. *Chicago Title & Trust Co. v. Levine*, 333 Ill.App.3d 420, 424 (3d Dist. 2002) (*citing American National Bank & Trust Co. v. Bentley Builders, Inc.*, 308 Ill.App.3d 246 (2d Dist. 1999)).

---

[9]   The plaintiffs in the Gambino Litigation sought relief by way of both quiet title and slander of title. Wolf was named a defendant only with respect to the slander of title action, while W.W. Funding was named a defendant with respect to each.

To succeed in the foregoing, a plaintiff must prove that the defendants acted with malice. *Levine,* 333 Ill.App.3d at 424 (*citing Bentley Builders,* 308 Ill.App.3d at 252). The act of maliciously recording a document that clouds another's title to real estate is actionable as slander of title. *Bentley Builders,* 308 Ill App.3d at 252 (*citing Whildin v. Kovacs,* 82 Ill.App.3d 1015, 1016 (1st Dist. 1980). However, if the party who records the document has reasonable grounds to believe that he has title or a claim to the property, he has not acted with malice. *Id.* at 252 (*citing Whildin,* 82 Ill.App.3d at 1016).

Malice is a question of fact. *Id.* at 252; *Whildin,* 82 Ill.App.3d at 1016. To prove malice, the plaintiff must show that the defendants acted with intent *or* with reckless disregard. *Levine,* 333 Ill.App.3d at 424 (*citing Bentley Builders,* 308 Ill.App.3d at 251-52). Put another way, a finding of malice may be predicated on reckless disregard alone. A finding of malice in an Illinois slander of title action does not mean, therefore, that the trial court addressed intent.

As the State Court determined, "[f]orged deeds have been determined to be clouds on title." *Gambino I,* No. 05CH4303 at 4 (*citing Oswald v. Newbanks,* 336 Ill. 490 (1929)). For that reason, the State Court considered whether a forgery had occurred.

Though discussed in further detail below, the court notes that with respect to forgery, there must be an intent to defraud. *Estate of Bontkowski v. Bontkowski,* 337 Ill.App.3d 72, 76 (1st Dist. 2003) (*citing Haffa v. Haffa,* 115 Ill.App.2d 467 (1st Dist. 1969)). Thus, to the extent that the State Court Decision found that a forgery had occurred, it also found, with respect thereto, that intent existed.

## DISCUSSION

### A.   Preclusion

Given what transpired before the State and Appellate Courts, the question of preclusion naturally arises. In its Complaint, in its motion for summary judgment and at trial, ATG contended that the State Court's findings of fact conclusively established that the debt was nondischargeable under section 523(a)(2)(A) and (a)(6) and that Wolf is precluded from relitigating those issues.

Preclusion is an equitable doctrine that exists, in main, to aid courts in "fulfilling the purpose for which civil courts had been established, the conclusive resolution of disputes within their jurisdiction." *Kremer v. Chemical Const. Corp.,* 456 U.S. 461, 467 (1982). For federal preclusion to apply, it must be shown that the party against whom preclusion is sought was afforded an opportunity for a full and fair hearing. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 333 (1979); *see also United States v. Mendoza,* 464 U.S. 154, 159 n.4 (1984).

Preclusion on this matter is, however, an issue of state, not federal, law. Under 28 U.S.C. § 1738, a state court judgment must be given the same preclusive effect in federal courts as it would be given in the courts of Illinois. *Allen v. McCurry,* 449 U.S. 90, 96 (1980) ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."). Accordingly, Illinois law determines the extent to which the state court judgment in this case should be given preclusive effect, *PaineWebber, Inc. v. Farnam,* 870 F.2d 1286, 1290 (7th Cir. 1989), even if the requirements for federal preclusion are not met. *In re Catt,* 368 F.3d 789, 792 (7th Cir. 2004) ("[T]he 'federal rule' is necessarily a rule about federal judgments.").

Ordinarily, preclusion is brought before the court by way of an affirmative defense and the party asserting that defense bears the burden of establishing it. *Adair v. Sherman*, 230 F.3d 890, 894 (7th Cir. 2000). The use of offensive, nonmutual preclusion has, however reluctantly, been approved by the Supreme Court. *Parklane Hosiery Co., Inc.*, 439 U.S. at 333; *see also Mendoza*, 464 U.S. at 159 n.4; *Wilson v. Souchet*, 168 F.Supp.2d 860, 865 (N.D. Ill. 2001) (trial courts have broad discretion under *Parklane* whether or not to apply offensive preclusion). Here, preclusion is sought by the plaintiff ATG. As in *Parklane*, the court here finds no reason to not apply offensive preclusion (other than, perhaps, those discussed below), should the elements be established by ATG.

Ordinarily, preclusion is viewed as being either claim preclusion (*res judicata* or estoppel by judgment) or issue preclusion (collateral estoppel or estoppel by verdict). While ATG has concentrated on questions of collateral estoppel, that question is best addressed with an understanding of how its scope is limited in opposition to *res judicata*. The court will, therefore, consider each doctrine in turn.

1.      Claim Preclusion (*Res Judicata*)

"*Res judicata* is a foundational principal of our legal system, a rule of fundamental and substantial justice that serves to maintain the private peace once an issue between parties has been litigated, and, as such, should be enforced by the courts." *In re Morrow*, 495 B.R. 378, 388 (Bankr. N.D. Ill. 2013) (Barnes, J.) (*citing Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299 (1917)). *Res judicata* "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Brown v. Felsen*, 442 U.S. 127, 131 (1979).

In order for *res judicata* to apply under Illinois law, there must be: (1) an identity of parties or their privies, (2) an identity of the causes of action, and (3) a final judgment on the merits in an earlier proceeding. *Dollie's Playhouse, Inc. v. Nable Excavating, Inc. (In re Dollie's Playhouse, Inc.)*, 481 F.3d 998, 1001 (7th Cir. 2007); *Shriners Hosp. for Children v. Bauman (In re Bauman)*, 461 B.R. 34, 42 (Bankr. N.D. Ill. 2011) (Schmetterer, J.).

The Seventh Circuit has made clear that *res judicata*, which is applied sparingly, is not applied at all in dischargeability actions. *Rigdon*, 36 F.3d at 1378 n.1 ("The Supreme Court has held that *res judicata* does not apply in bankruptcy discharge exception proceedings.") (*citing Brown v. Felsen*, 442 U.S. 127 (1979)); *see also Levinson v. U.S.*, 969 F.2d 260, 262-64 (7th Cir. 1992) (holding that the bankruptcy court was best suited to determine questions underlying nondischargeability).

For the foregoing reason, there is no need to consider *res judicata* here. Nonetheless, were it considered, the principle would be found inapplicable for one fundamental reason: An action for slander of title is simply different than a nondischargeability action. There is no identity of the causes of action and no reason therefore to apply *res judicata*.

2.      Issue Preclusion (Collateral Estoppel)

The doctrine of collateral precludes a party from relitigating an *issue* already decided in a prior proceeding. *Herzog v. Lexington Twp.,* 167 Ill.2d 288, 293 (1995). It applies in nondischargeability actions, *Grogan*, 498 U.S. at 284 n.11; *Brown v. Fleson*, 442 U.S. 127, 139 n.10

(1979); *see also Adams v. Adams*, 738 F.3d 86, 865 (7th Cir. 2013) ("Issue preclusion principles apply to prevent the relitigation of issues in bankruptcy proceedings, just as they do in other cases."), and may be applied to either or both issues of fact or issues of law that were determined previously. *LaSalle Nat'l Bank v. Cnty. of DuPage,* 856 F.2d 925, 930 n.2 (7th Cir. 1988); *see also Rigdon,* 36 F.3d at 1378 n.1.

Under Illinois law, collateral estoppel requires that "(1) the issues decided in the prior adjudication are identical to issues presented for adjudication in the current proceeding; (2) there be a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party or in privity with a party in the prior action." *Kalush v. Deluxe Corp.*, 171 F.3d 489, 493 (7th Cir. 1999); *see also Gumma v. White,* 216 Ill.2d 23, 38 (2005). "[T]he party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation." *Am. Family Mut. Ins. Co. v. Savickas,* 193 Ill.2d 378, 387 (2000). The previous litigation had to afford an effective, full and fair opportunity to the party against estoppel is sought to litigate the issue in the prior proceedings, *LaHood v. Couri,* 236 Ill.App.3d 641, 645-46 (3d Dist. 1992), for "while the purpose of the doctrine is to prevent a party from litigating the same issue twice, it should not be used to preclude a party from litigating the matter at all." *Gay v. Open Kitchens,* 100 Ill.App.3d 968, 972 (1st Dist. 1981).

Note here a fundamental difference in predicates for collateral estoppel versus *res judicata*. In *res judicata*, an identity of the parties or their privies is required. In collateral estoppel, only the party against who estoppel is asserted – or that party's privy – need have been a party in the underlying action. *Blonder-Tongue Labs. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971).[10]

Also, as with *res judicata* in general, collateral estoppel is not to be applied in an unrestrained manner, rather, its application must be narrowly tailored to fit the precise facts and issues that were determined in the prior action. *Nowak v. St. Rita High Sch.*, 197 Ill.2d 381, 391 (2001). The party claiming collateral estoppel has the burden of establishing it by clear, concise, and unequivocal evidence. *Waste Mgmt. of Ill., Inc. v. Pollution Control Bd.,* 187 Ill.App.3d 79, 83 (2d Dist. 1989).

Here, ATG argues two separate triggers for collateral estoppel in this Adversary. First, ATG argues that the State Court's determination in the Gambino Litigation should be preclusive on all the elements of nondischargeability. Second, ATG argues that a related case should also act to preclude Wolf from litigating here the question of nondischargeability. The court will consider each prior case, in turn.

---

[10]   Traditionally, the rule of collateral estoppel has required that the parties in the second action be the same as or privy to those parties in the first action. Recent cases have relaxed this rule and require only that the party to be collaterally estopped be the same party or privy to a party in the first action, while the party urging the estoppel may be new. (*Blonder-Tongue Laboratories v. University of Illinois Foundation* (1971), 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788; *Farmers Oil & Supply Co. v. Illinois Central R. R. Co.* (1972), 6 Ill.App.3d 965, 286 N.E.2d 68; *Stevenson v. Baker* (1974), 18 Ill.App.3d 542, 310 N.E.2d 58; *Drabik v. Lawn Manor Savings & Loan Association* (1978), 65 Ill.App.3d 272, 22 Ill.Dec. 13, 382 N.E.2d 333.)

*Lady v. Montgomery Ward & Co., Inc.,* 80 Ill.App.3d 69, 72-73 (4th Dist. 1980).

a.    The Gambino Litigation

ATG contends that the factual findings in the State Court Decision in the Gambino Litigation are sufficient to establish the elements of a section 523 action. This assertion has a fundamental flaw to it, one noted earlier and worth discussing further here.

Before doing so, however, the court must first address whether the *Kalush* factors are present, *Kalush,* 171 F.3d at 493; *see also Gumma,* 216 Ill.2d at 38, and whether Wolf, the party against whom estoppel is being sought, had an effective, full and fair opportunity to litigate in the prior action. *LaHood,* 236 Ill.App.3d at 645-46.

Wolf does not dispute that the State Court Decision is a valid and final judgment on the merits. Nor does he dispute he was a party or in privity with a party, namely W.W. Funding,[11] in the Gambino Litigation. Wolf does contend, however, that the issues decided in the Gambino Litigation are not identical to the issues presented in the current Adversary. The court may therefore accept that the second and third factors set forth in *Kalush* are present.

Wolf does argue, however, that the issue of intent to defraud and cause harm to Plaza Bank and ATG was not addressed in the State Court Decision. In other words, Wolf challenges whether the first factor of *Kaluth* has been satisfied. As to that narrow question, whether the State Court Decision contains the necessary predicates for a finding of nondischargeability, the court agrees with Wolf.

Intent is a necessary component of nondischargeability under both section 523(a)(2)(A) and (a)(6). For collateral estoppel to be outcome determinative in this Adversary, therefore, the issue of intent must have been determined by and necessary to the State Court Decision. *Savickas,* 193 Ill.2d at 387.

Here the State Court made specific factual findings that a scheme existed to divest Gambino of ownership of real estate and/or an interest in real estate through a series of forgeries, misrepresentations and other fraudulent conduct. *Gambino I,* No. 05CH4303 at 5-8. The State Court found that there was overwhelming evidence that the deeds involved in the transfer of title to the Niles Property were forged and the evidence established the requisite malice to support a slander of title claim as to Gambino. In this regard, the State Court specifically found that Wolf actively committed and engaged in fraud in concert with others that resulted in W.W. Funding obtaining improper title to the Niles Property, and that Wolf acted with malice. *Id.* at 15.

The State Court went beyond a mere finding of recklessness or gross negligence, and found that "punitive damages are warranted here as well. There was fraud and malice on the part of the defendants here." *Id.* at 18. However, the State Court did not in the State Court Decision make any finding of intent on the part of Wolf. Intent is never mentioned.

---

[11]    While Wolf does not appear to contest that W.W. Funding is Wolf's privy for the purposes of preclusion and further discussion may be, therefore, unnecessary, the court notes its agreement with the State Court that Wolf clearly used W.W. Funding to complete the transactions the State Court found to be slanderous. *Gambino I,* No. 05CH4303 at 16. The State Court equated Wolf's actions with those of W.W. Funding, and this court agrees. W.W. Funding was Wolf's privy for these purposes.

As noted above, in Illinois, a trial court need not find intent to provide relief in a slander of title action. Such a ruling is predicated on a finding of malice, *Levine*, 333 Ill.App.3d at 424, and a finding of malice may be predicated on reckless disregard alone. *Id.* Illinois law also allows punitive damages to be awarded for gross negligence. *See Slovinski* v. *Elliot*, 237 Ill.2d 51, 58 (2010) ("Punitive damages may be awarded . . . when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.'" (*quoting Kelsay* v. *Motorola, Inc.*, 74 Ill.2d 172 (1978))).

The fact, therefore, that the State Court failed to discuss intent in the State Court Decision is fatal to ATG's argument that the State Court Decision is preclusive here, insofar as that argument relies solely on the State Court Decision. It was for these reasons that the court declined to apply collateral estoppel to the issue at summary judgment and therefore denied summary judgment, and it was on the question of intent that the matter went to trial.

As the Trial and the further posttrial briefing of the parties has made clear, however, issue preclusion may still apply. While the State Court Decision failed to address Wolf's intent, a determination of Wolf's intent by this court may still be affected by preclusion, in two ways:

First, many of the factual predicates for a finding of intent appear in the State Court Decision. The State Court made specific findings regarding Wolf's participation in the transactions that Wolf attempted to challenge at trial. For example, the State Court specifically found that Wolf "was actively involved with all of the transactions that resulted in WW Funding, LLC obtaining title to the Niles and Kedzie properties," *id.* at 14, despite the many assertions by Wolf in the Gambino Litigation, and in contradiction to testimony of three different witnesses, that he did not attend any of the closings of the Properties. *Id.* at 13-14.[12]

At the Trial in this Adversary, Wolf again testified that he did not attend those meetings. Tr. 95-96, Apr. 14, 2014; 590, Apr. 16, 2014. But that fact has been determined and was central to the State Court Decision. It is this court's determination that the State Court's findings cannot be disregarded here (and further have been substantiated by testimony before this court), and that collateral estoppel applies to preclude its relitigation here.

Second, the Appellate Court, in affirming the State Court's findings and judgment, emphasizing that the State Court "found that the harm here was the result of intentional malice, trickery, and deceit." *Gambino III*, 398 Ill.App.3d at 71; *see also id.* at 70 ("The trial court found that the malice exhibited by [the Wolf] defendants was beyond that necessary to establish the elements of the plaintiffs' slander of title claims."). The Appellate Court also held that a finding of fraudulent intent was also necessary to the quiet title counts and forgery determination. These factors seemed to weigh heavily in the decisions of the District Court and the Seventh Circuit in the Koonce Litigation (as defined and discussed below).

---

[12]     The State Court repeatedly found that Wolf denied attending the closing meetings but testified that he had two meetings with Gambino. However, "[t]he court flatly disbelieve[d] this testimony," and found that "[t]his was strange testimony, inherently unbelievable and shown to be so" through the many "inconsistencies in the versions Mr. Wolf gave at trial and those given at his deposition." *Gambino I*, No. 05CH4303 at 14.

As stated by the Appellate Court, "[i]ntent to defraud is a question of fact, which may be proved by circumstantial evidence and inferred from the facts and circumstances surrounding the transaction." *Gambino III*, 398 Ill.App.3d at 54.

As a question of fact, it is the determination of the trial court that should govern, unless the standard of review applied by the Appellate Court allowed for *de novo* or similar consideration. It appears, however, that just such a broader review was in play. As stated by the Appellate Court, "[a] reviewing court may affirm the trial court's judgment on any basis which appears in the record, regardless of the basis relied upon by the circuit court." *Id.* at 54 (*citing Estate of Bontkowski*, 337 Ill.App.3d at 78). Further, "[t]he real issue on appeal is not the reasoning of the [trial] court nor the basis for its decree, but whether its decree was correct." *Id.* Thus while the State Court did not make a specific finding on intent, the Appellate Court appears to have expanded the State Court's reasoning in such a manner that intent was addressed.

In retrospect then, it does appear that taken together, the rulings of the State and Appellate Court did address intent in a limited fashion. They did not, however, specify whose intent, and this court is unwilling to infer such intent was Wolf's when there were multiple actors. Even it were, the driving principle of collateral estoppel – preventing relitigation of matters – would not be served here, as the Trial has been concluded. Because collateral estoppel is, under Illinois, an equitable doctrine, a court can decline to apply it should application result in inequity. *Benton v. Smith*, 157 Ill.App.3d 847, 889-890 (1st Dist. 1987) ("[E]quity dictates that the doctrines of *res judicata* and collateral estoppel not be applied technically so as to create inequitable and unjust results. (*Jones v. City of Alton citing Rotogravure Service, Inc. v. R.W. Borrowdale Co.*) A preclusive effect will not be applied where it results in manifest injustice. *Hansberry v. Lee* (1940), 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22."); *accord Nowak*, 197 Ill.2d at 391.

Such hesitancy does not apply, however, to the specific findings of fact in the Gambino Litigation. As noted above, the factors for collateral estoppel under Illinois law are met, and the factual determinations – other than the specific determinations regarding intent, if any – are preclusive. To the extent that ATG relies on the factual findings made by the State Court in the Gambino Litigation to prove the elements of sections 523(a)(2)(A) or (a)(6), the Debtor is collaterally estopped from challenging such findings.

      b.     The Koonce Litigation

In its post-closing Supplemental Brief and Closing Statement, ATG relies heavily on a case referred to by ATG as the bankruptcy "mirror case," one involving Dennis Koonce ("Koonce") (one of Wolf's co-defendants in the Gambino Litigation) and in which judgment was entered against Koonce based upon the preclusive effect of the Gambino Litigation and State Court Decision (the "Koonce Litigation").[13]

As with Wolf, Koonce sought bankruptcy protection. As in this case, the discharge of the obligations under the State Court Decision were challenged.

---

[13]    *Estate of Gambino v. Koonce*, Adv. No. 10ap00129 (Bankr. N.D. Ill. Aug. 25 2011) (Black, J.), *aff'd sub nom. Gambino v. Koonce*, No. 11 C 7379, 2013 WL 3716654 (N.D. Ill. July 12, 2013) (hereinafter, "Koonce I"), *aff'd*, 757 F.3d 604 (7th Cir. 2014) (hereinafter, "Koonce II").

In the Koonce Litigation, the Gambino Estate first unsuccessfully sought summary judgment. Later, the Gambino Estate sought by way of motion *in limine* to prevent Koonce from introducing testimony disputing the issues and findings of fact in the State Court Decision. The bankruptcy court ruled in favor of the Gambino Estate on the motion *in limine* and, as a result, an order granting Gambino's motion for judgment on the pleadings and finding the debt nondischargeable was also entered. Koonce appealed.

On appeal, the District Court considered the issue of intent, and concluded the issue of intent had been "actually litigated in the state court proceedings." *Koonce I*, 2013 WL 3716654, at *4. The District Court was convinced that, given the totality of the State Court's ruling, that the State Court had considered the issue of intent. *Id.* at *5. Further, the District Court noted that a finding of forgery required a finding of intent, and that irrespective of the absence of any discussion of intent in the State Court Decision, intent must have been determined. *Id.* For these reasons, the District Court affirmed, and Koonce once again appealed.

The Seventh Circuit, in considering the appeal, found that the issue of Koonce's intent had been "actually litigated" in the State Court. *Koonce II*, 757 F.3d at 609. The Seventh Circuit further found that the issue of intent was a necessary part of the State Court Decision. *Id.* at 610.

The Seventh Circuit decision puts the matter before the court in an awkward posture. Principles of *stare decisis* require that this court follow the Seventh Circuit's rulings. *In re Shattuc Cable Corp.*, 138 B.R. 557, 565 (Bankr. N.D. Ill. 1992) (Katz, J.). The same does not hold true of district courts. *Abernathy v. U.S. (In re Abernathy)*, 150 B.R. 688, 693 n. 7 (Bankr. N.D. Ill. 1993) (Ginsberg, J.) ("Since district court bankruptcy decisions do not bind other district judges in the district, *see United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569, 572 (7th Cir. 1987), they are not binding on bankruptcy courts either. *In re Shattuc Cable Corp.*, 138 B.R. 557, 565-67 (Bankr. N.D. Ill. 1992).").

Quite frankly, this court determined then and continues to believe that the State Court Decision, even take together with the decision of the Appellate Court, failed to properly address intent. Not only was intent never mentioned in the State Court Decision, all of the legal issues determined by the State Court except for forgery could have been determined without a finding of intent, and a single, passing reference to intent in the Appellate Court's decision is not enough. *See, e.g., Suntrust Bank v. Bennett (In re Bennett)*, Adv. No. 14-90079, 2014 WL 4199092, at *6 (Bankr. M.D. Tenn. Aug. 21, 2014) (a single, passing reference to "fraud" in state court decision was insufficient to preclude fraud in section 523 proceeding).

With respect to forgery, while intent is unquestionably a required element, there is no discussion by the State Court of which of the multiple defendants committed the forgery, only who benefited from it and utilized the forged documents. This leaves the record hopelessly disconnected. Wolf and W.W. Funding could be held culpable on a less than intentional standard if, for example, Waxman or Koonce committed the forgery but W.W. Funding and Wolf benefited therefrom. Nothing in the State Court Decision would appear to require change.

This left the court with doubts as to the preclusive effect of the State Court Decision, and as the Seventh Circuit has said, "[d]oubts are resolved against preclusion." *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 933 (7th Cir. 2003) (*citing In re Associated Vintage Grp., Inc.*, 283 B.R. 549, 562 (B.A.P. 9th Cir. 2002)). For this reason, the court declined to follow the District Court ruling in

the Koonce Litigation. The Seventh Circuit, however, agreed with the District Court, and this court is bound by the Seventh Circuit. The question is, to what extent?

The Koonce Litigation is not the law of this case and neither *res judicata* or collateral estoppel would cause the Seventh Circuit's ruling to be preclusive on Wolf, who was not a party to the Koonce Litigation. In fact none of the parties or privies here (Wolf, W.W. Funding, ATG nor Plaza Bank) were party to the Koonce Litigation. Under no circumstance then, would the third of the *Kalush* factors be met.

Further, *stare decisis* is limited to decisions of law. As the Seventh Circuit has stated, "[w]hen this court has laid down a principle of law as applicable to a certain state of facts, under the doctrine of *stare decisis* we must adhere to that principle and apply it to all future cases, where the facts are substantially the same." *Boyle v. U.S.*, 710 F.2d 1251, 1256 (7th Cir. 1983) (Coyle, C.J., concurring), *rev'd on other grounds*, 469 U.S. 241 (1985). As stated by the Appellate Court, the question of intent is one of fact, *Gambino III,* 398 Ill.App.3d at 54 ("Intent to defraud is a question of fact, which may be proved by circumstantial evidence and inferred from the facts and circumstances surrounding the transaction."), and therefore any legal determination of facts should not bind under principles of *stare decisis* alone.

There is one final reason this court should inquire further into the question of intent. In the Koonce Litigation, the party seeking a finding of nondischargeability was the Gambino Estate, the party that the Gambino Litigation defendants arguably intended to harm. Nothing in the State Court Decision, taken alone, stands for the proposition that Wolf's intent, should it have existed, was intent to harm Plaza Bank or ATG. That was not the issue before the State Court. Because section 523(a)(6), for example, requires an intent to injure, not just an intent to act, *see, e.g., Horsfall*, 738 F.3d at 774-75, it is unclear whether the intent with respect to Gambino (either to defraud Gambino or to injure Gambino) may be imputed as an intent to injure others the way it might be under criminal law or tort, and neither of the parties has argued that issue before this court. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). So irrespective of the conclusions of the District Court and the Seventh Circuit in the Koonce Litigation, the preclusion issue remains unresolved.

While several arguments raised in the Koonce Litigation caused this court to inquire into the Gambino Litigation, as discussed above, the court cannot conclude that there is any preclusive effect here of the decisions in the Koonce Litigation. Even if there were, the same hesitancy expressed above would apply here. As the Trial concluded before the Seventh Circuit decision was issued, and because the outcome would not change, the court exercises its equitable discretion under Illinois law to not preclude an inquiry that has already taken place.

For these reasons, ATG's arguments with respect to the Koonce Litigation are not well taken.

B.    Dischargeability of Wolf's Debt

As the party raising a challenge to the dischargeability of debt, ATG bears the burden of proof. *Scarlata*, 979 F.2d at 524; *Gunsteen*, 487 B.R. at 899. In order to carry that burden, ATG must show that the debt in question is owed by Wolf, and then whether the applicable factors under section 523 have been met. The court will consider each, in turn.

1.     Wolf's Liability on the Plaza Bank Loan and Under the ATG Owner Policy

It must first be established that Wolf in fact owes the underlying obligation. In other words, there must first be a debt to discharge. *Tomlinson*, 1999 WL 294879, at \*7.

Wolf does not dispute that he is personally liable on the Plaza Bank Loan. At Trial, Wolf acknowledged that he did execute the Guaranty guaranteeing the payment and performance under the Mortgage and the Note. As a result of the State Court Decision finding in favor of Gambino in the Gambino Litigation, ATG indemnified Plaza Bank and paid off the loan balance on the Plaza Bank Loan. After that, Plaza Bank assigned the right to pursue remedies under the Mortgage, Note and Guaranty to ATG, which ATG is seeking to do in this proceeding. Therefore, Wolf is personally liable to ATG on the Plaza Bank Loan.

Is Wolf personally liable to ATG for the costs in defending Wolf and Plaza Bank in the Gambino Litigation, however? ATG argues that Wolf is liable because he had knowledge of a matter that did not appear in the public record but that was adverse to W.W. Funding's title to the Niles Property. Specifically, ATG alleges that Wolf knew that the deeds purportedly conveying title to the Niles Property had been forged, W.W. Funding could not obtain clear and indefeasible title to the Niles Property because of such forged deed(s) and Wolf was a part of a scheme to deprive Gambino of his interest in the Niles Property. Therefore, ATG contends that Wolf's failure to inform ATG of the title issues constituted an omission resulting in exclusion of coverage under the owner title insurance policy issued to W.W. Funding, meaning Wolf was liable for his own defense costs. Since ATG paid those costs, it seeks reimbursement from Wolf.

The Court agrees with ATG. Wolf testified that he and Waxman created W.W. Funding specifically for the purpose of obtaining and holding title to the Niles Property. Tr. 153-54, Apr. 14, 2014. The State Court found both Wolf and W.W. Funding culpable in the fraudulent scheme to deprive Gambino of his interest in the Niles Property. *Gambino I*, No. 05CH4303 at 14-16. The State Court further found that Wolf was on notice that the deeds were forged. *Id.* at 15. As a result, Wolf knew that W.W. Funding could not obtain clear title, but failed to disclose such information to ATG when applying for the title insurance policy on behalf of ATG and when tendering defense of the Gambino Litigation to ATG pursuant to such policy. Wolf knew or should have known that if he disclosed this information to ATG, ATG would likely not have issued the insurance policy. Wolf therefore knew or should have known that this failure to disclose exposed ATG to the risk of having to pay out on the policy once the fraudulent scheme was discovered. Therefore, Wolf is personally liable on the debt to ATG.

2.     Section 523(a)(2)(A) Claims

ATG predicates Counts I and III of the Complaint on section 523(a)(2)(A). To award judgment in favor of ATG on those courts, this court must find the existence of false pretenses, false representation(s), or actual fraud, 11 U.S.C. § 523(a)(2)(A), and find that such fraud is attributable directly or indirectly to the debtor. *See Jahelka*, 442 B.R. at 668.

a.    False Representation and False Pretenses

(1)    Alleged False Representations to ATG

In Count I, ATG alleges that Wolf made false representations by omission to induce ATG to issue title insurance policies to Plaza Bank and W.W. Funding.

Specifically, ATG alleges that Wolf failed to disclose the following material facts to ATG both before obtaining title insurance from ATG and in tendering a defense on behalf of W.W. Funding in the Gambino Litigation: (a) The deed to the Niles Property from North Star to Gambino in December 2002 was forged; (b) The Warranty Deed was forged and Gambino never agreed to the transfer; (c) W.W. Funding would not be obtaining clear and indefeasible title to the Niles Property at the closing; (d) Wolf was causing W.W. Funding to slander the title to the Niles Property; (e) Plaza Bank was obtaining an invalid mortgage in the Niles Property; (f) Wolf was participating in a scheme to deprive Gambino of his interest in the Niles Property and therefore Gambino ha claims against W.W. Funding and Wolf; (g) Wolf, through W.W. Funding, was getting more than $135,000 from the purchase of the Niles Property through the Plaza Bank Loan; and (h) The allegations in the Gambino Litigation complaint were generally true.

ATG contends that Wolf intended to deceive and defraud ATG when he failed to inform ATG of the above facts, and argues that ATG would not have issued the title insurance policies or defended W.W. Funding and Plaza Bank in the Gambino Litigation. Having not issued the policies, ATG would not have incurred legal fees and costs associated therewith and would not have had to pay off the remaining balance due on the Plaza Bank Note. Finally, ATG alleges that Wolf had a legal duty to make such disclosures.

Wolf admits that he did not inform ATG of any of these disclosures. Tr. 188-201, Apr. 14, 2014.

(2)    Alleged False Representations Made to Plaza Bank

In addition, in Count III, ATG, as assignee of the Mortgage, Note and Guaranty, alleges that Wolf made false representations that he knew to be false at the time to induce Plaza Bank to make the Plaza Bank Loan.

Specifically, ATG contends that Wolf represented to Plaza Bank that W.W. Funding was acquiring good title and that he was not aware of any potential claims against title or himself in connection with the Niles Property. ATG alleges that Wolf did so with the intent to defraud Plaza Bank, used W.W. Funding to obtain the Plaza Bank Loan to purchase the Niles Property, acquire title to it and grant Plaza Bank the Mortgage on the Niles Property to secure the Plaza Bank Loan.

ATG further alleges that: (a) In the Guaranty, Wolf represented that "no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against [Wolf] is pending or threatened ..."; (b) Wolf agreed to allow Plaza Bank to record the Mortgage, signed by Wolf, against the Niles Property to secure the Plaza Bank Loan; (c) The Mortgage contained a representation that W.W. Funding "holds good and marketable title of record to the [Niles] Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy ..."; (d) Wolf represented in the Guaranty that he would "perform [W.W. Funding's] obligations under the Note and Related

27

Documents [e.g., Mortgage]"; and (e) By virtue of his agreement to perform the obligations of W.W. Funding, Wolf made the further representation in the Mortgage that he "warrants . . . title to the [Niles] Property against lawful claims of all persons."

ATG contends that such representations were false, Wolf knew they were false when he made them, and Wolf intended to deceive and defraud Plaza Bank when he made them. ATG argues that Plaza Bank would not have made the Plaza Bank Loan had Wolf not made the aforementioned misrepresentations and Wolf had a legal duty not to make such misrepresentations.

(3)    Misrepresentations/Omissions of Fact

The court has considered each of the foregoing allegations in light of the facts adduced at the Trial and determined by the State Court, and concludes that ATG has established that both Wolf and W.W. Funding made, with knowledge of their falsity or reckless disregard for the truth, misrepresentations or omissions of fact related to a fraudulent scheme. The court further concludes that those misrepresentations or omissions of fact, as determined by the State Court, induced Plaza Bank to make the Plaza Bank Loan and ATG to issue the title insurance policy. The court concludes that ATG justifiably relied on those misrepresentations or omissions of fact.

Wolf failed to disclose to either ATG or Plaza Bank that W.W. Funding was not obtaining good title to the Niles Property, and Wolf affirmatively represented to Plaza Bank that W.W. Funding was obtaining good title. Specifically, Wolf represented and warranted to Plaza Bank in the Guaranty executed by him that there was no pending or threatened litigation, claim, investigation, administrative proceeding or similar action against W.W. Funding. W.W. Funding warranted in the Mortgage that was executed by Wolf's attorney on behalf of Wolf that it held good and marketable title of record to the Niles Property in fee simple, which Wolf knew was false at the time the Mortgage was executed, and, based on the findings of the state court, that he participated in a fraudulent scheme to obtain such title. The Court also finds that both Plaza Bank and ATG justifiably relied on the misrepresentations or omissions made by Wolf and W.W. Funding.

Plaza Bank relied on the misrepresentations or omissions by making the loan to W.W. Funding. Joseph Marzan, Senior Vice President and Senior Lender for North Shore Community Bank, the successor by merger to Plaza Bank, testified that he was the loan officer at Plaza Bank at the time of the loan to W.W. Funding to purchase the Niles Property and that Plaza Bank would not have made the loan on the Niles Property had it known the Warranty Deed was forged, W.W. Funding was not obtaining clear title, or the Mortgage would not be valid. Tr. 71-73, Apr. 14, 2014.

ATG relied on the misrepresentations or omissions by issuing both the owners and mortgagee title insurance policies. Michael Brandt, Vice President of Claims and Litigation for ATG, testified at the Trial that had ATG known that the Warranty Deed was forged or that that W.W. Funding was not obtaining clear title, it would not have issued either policy. Tr. 121-24, Apr. 14, 2014.

In relying on the Warranty Deed, which was signed and notarized, both Plaza Bank and ATG acted reasonably and justifiably. There was no way of knowing, looking at the face of the Warranty Deed itself, that it was forged or invalid.

b.     Intent

As discussed in detail earlier, the crux of this Adversary is whether Wolf, individually or through W.W. Funding, made such misrepresentations or omissions with the intent to deceive Plaza Bank or ATG. ATG contends that, given Wolf's intent to defraud Gambino as found by the State Court, Wolf necessarily intended to defraud ATG and Plaza Bank. Given this court's ruling on summary judgment and herein regarding preclusion, the question as more refined thereby is whether ATG has in this matter established the requisite intent.

The court concludes that it has.

At the Trial, the court articulated that both section 523(a)(2)(A) and section 523(a)(6) require an element of intent, though direct evidence rarely presents itself to that end. Tr. 223-24, Apr. 14, 2014. Instead, the court must look to the totality of the circumstances to establish intent. Tr. 224, Apr. 14, 2014. As finder of fact, the court is permitted to draw inferences from evidence in the record.

The circumstances surrounding the Niles and Kedzie transactions provide ample indicia of Wolf's intent to defraud not just Gambino, but the other parties to the transaction. Moreover, contradiction pervades much of Wolf's testimony concerning both transactions, thereby impugning Wolf's overall credibility. Specifically, the purported meeting between Gambino and Wolf as well as the sequence of events leading up to the closing of the Niles Property demonstrate Wolf's unreliability as a witness and furnish sufficient evidence to establish intent.

The State Court found that Wolf's testimony as a whole regarding the meeting with Gambino was "inherently unbelievable," and relied on that conclusion to arrive at the factual finding that Wolf fabricated the meeting. *Gambino I*, No. 05CH4303 at 14. Despite that finding, which is binding on the court, Wolf, in attempting to provide clarity in the matter at bar, provided similarly contradictory testimony at Trial.

Wolf testified that he met with both Gambino and Zippershtein prior to the Niles Property transaction at a meeting, Tr. 582-88, Apr. 16, 2014, yet Wolf went on to testify on cross examination that Gambino and Zippershtein were never in the same room at the same time. Tr. 621, Apr. 16, 2014. Wolf maintained that during the meeting he discussed a repurchase option with Gambino, who was in agreement with the overall terms of the transaction. Tr. 624-25, Apr. 16, 2014. According to Wolf, this was in accordance with his standard deal structure, which gives the seller an option to reacquire the property. Tr. 155-58, Apr. 14, 2014. Wolf testified that he told Gambino the decision had not been made to give Koonce the repurchase option prior to the meeting, Tr. 625, Apr. 16, 2014, despite moments earlier stating that he had agreed to give Koonce the option before the meeting, Tr. 612, Apr. 16, 2014. To complicate matters, Wolf also testified that he had never met Koonce prior to the Gambino Litigation. Tr. 609, Apr. 16, 2014. Despite all testimony to the contrary, Koonce, not Gambino, was given a repurchase option in both Kedzie and Niles transactions. *Gambino I*, No. 05CH4303 at 15 The Circuit Court concluded that inconsistencies such as these in testimony were indicative that no meeting between the two parties actually took place. *Id.* The court agrees. The court finds little credibility to Wolf's testimony.

Turning to the details of the Niles Property transaction itself, the Circuit Court found that Wolf was "actively involved" with all of the Kedzie and Niles transactions. *Id.* At the time of the

transaction, the Niles Property was worth between $550,000 and $700,000. Tr. 177, Apr. 14, 2014. W.W. Funding purchased it for $230,000. *Id.* Wolf testified that W.W. Funding received only a $25,000 fee for the Nile Property transaction, which he split with Waxman, while the remainder of the proceeds were put into escrow. Tr. 595-96, Apr. 16, 2014. However, this statement contradicts prior testimony and the HUD-1 from the transaction, both of which indicated that instead of a fee, W.W. Funding received $135,171.38 from the transaction while Gambino received nothing. Tr. 187, Apr. 14, 2014.

Despite the typical practice that sellers' attorneys prepare the deed conveying property, Tr. 309, 494, Apr. 15, 2014, Waxman testified that Smith or someone in his office had prepared the Warranty Deed. Tr. 309-10, Apr. 15, 2014. Smith testified that his office had also prepared the affidavit of title and bill of sale for the Nile Property transaction. Tr. 309, 494, Apr. 15, 2014. Though Wolf was represented at closing through power of attorney by Smith, Gambino was not present and neither was Koonce, who Waxman asserted possessed power of attorney Gambino. Tr. 309, Apr. 15, 2015. Instead, DiBenedetto produced the required documents signed by Gambino. Tr. 439, Apr. 15, 2014. These documents were later determined to be forgeries by the State Court. *Gambino I,* No. 05CH4303 at 5, 7. While the HUD-1 for the Nile Property transaction indicates legal fees were paid to Smith, erroneously listed as "seller's attorney," no legal fees are listed to be paid to counsel for Gambino, the alleged "seller."

Though taken in isolation, each of these factors might not suffice to establish intent; the court must look to the totality of the circumstances. *Logan,* 327 B.R. at 911.

Given the facts found by the State Court to which the court is bound, the evidence on the record and the court's independent analysis of witness credibility, it is the court's determination that ATG has satisfied its burden of establishing Wolf's intent to defraud Gambino by the totality of the circumstances.

But what about intent vis-à-vis ATG and Plaza Bank?

ATG argues that Wolf's intent may be inferred from the facts and circumstances from the findings of the state court in the Gambino Litigation coupled with Wolf's actions to obtain a loan from Plaza Bank, which presents a picture of deceptive conduct on Wolf's part. *See Logan,* 327 B.R. at 911; *see also Hanson,* 432 B.R. at 773. The Court agrees.

The State Court in *Gambino I* found that Wolf created and used W.W. Funding to complete the Niles and Kedzie transactions and to be title holder for both properties. *Gambino I,* No. 05CH4303 at 16 . Wolf testified that W.W. Funding had no employees other than himself and Waxman. Tr. 153, Apr. 14, 2014. Waxman testified further that W.W. Funding was formed strictly for the "hard-money" loan to Gambino. Tr. 236, Apr. 15, 2014. In order to secure a loan from Plaza Bank: (1) Wolf and Waxman signed a promissory note payable to Plaza Bank on behalf of W.W. Funding ,dated June 18, 2007; (2) Wolf signed a commercial guaranty in favor of Plaza Bank; and, (3) with Wolf's authority, Smith signed a mortgage document granting Plaza Bank a mortgage in the Niles property. Joint Pretrial Stmt, 38-42.

Wolf knew that if he did not sign the Mortgage, Note and Guaranty on behalf of W.W. Funding, Plaza Bank would not make the loan to W.W. Funding. Joint Pretrial Stmt, 43. The guaranty that Wolf signed states that: "Guarantor represents and warrants to Lender that... (H) no

litigation, claim, investigation, administrative proceeding or similar action... against Guarantor is pending or threatened... Guarantor absolutely and unconditionally guarantees... the performance and discharge of all Borrower's obligations under the Note and the Related Documents." Joint Pretrial Stmt, 54-55. As a related document, the mortgage executed by Smith with Wolf's authority states that: "Grantor warrants that: (a) Grantor holds good and marketable title of record to the [Niles] Property in fee simple...[and] Grantor warrants title to the [Niles] Property against all lawful claims of all persons." Joint Pretrial Stmt, 57. Despite the above language, Wolf executed all documents while failing to disclose that W.W. Funding was not obtaining good and marketable title, Tr. 188-201, Apr. 14, 2014, while Wolf was on notice that title was fraudulently acquired, *Gambino I*, No. 05CH4303 at 15. From these events, the court can infer that Wolf intended to deceive Plaza Bank in order to obtain a loan as a part of the scheme to defraud Gambino in the Niles Property transaction.

Furthermore, Plaza Bank required a title insurance policy commitment prior to making the Plaza Bank Loan . Tr. 70, Apr. 14, 2014. Wolf testified that he knew Plaza Bank would not issue a loan without a policy in place. Tr. 183, Apr. 14, 2014. Though title insurance is typically procured by the seller (owner title and mortgagee title insurance policies are generally part of the same transaction), Wolf testified that "someone" obtained a mortgagee title insurance policy from ATG for Plaza Bank on his behalf. Tr. 108-109; 190, Apr. 14, 2014. Wolf also testified that he never told ATG that the deed from Gambino was forged, or that the mortgage Plaza Bank was granted on the Niles property was invalid. Tr. 188-201, Apr. 14, 2014. Wolf knew that if a claim was ever asserted against W.W. Funding or Plaza Bank to quiet title on the Niles property, ATG would be under a duty to defend and indemnify W.W. Funding and Plaza Bank based upon these insurance policies. Joint Pretrial Stmt, 46. These facts, in combination with those established by the State Court as to Wolf's intent to defraud Gambino, provide further evidence of Wolf's intent to defraud ATG through the consummation of the Niles Property transaction.

For the foregoing reasons, the Court finds that ATG has established by a preponderance of the evidence that Wolf, individually or through W.W. Funding, knowingly made false representations or omissions which he knew or should have known would induce Plaza Bank to make the loan to W.W. Funding and induce ATG to issue both the owner and mortgagee title insurance policies, which infers an intent to deceive under section 523(a)(2)(A), *see Jairath*, 259 B.R. at 315, and the Debtor's debt on the Plaza Bank Loan and the ATG indemnification is nondischargeable.

3.    Section 523(a)(6) Claims

Counts II and IV of the Complaint assert claims under section 523(a)(6) of the Bankruptcy Code. Count II alleges that Wolf willfully and maliciously induced ATG to issue a title insurance policy by failing to disclose material facts about the fraudulent scheme against Gambino to acquire title to the Niles Property. ATG states that such action caused ATG injury when it had to defend Wolf and Plaza Bank in the state court quiet title action and pay off the mortgage loan balance to Plaza Bank. In Count IV, ATG, as assignee of the Mortgage, Note and Guaranty, makes the same allegations of Wolf's actions as to Plaza Bank's injury.

Section 523(a)(6) excepts from discharge debts for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To prevail,

ATG must prove that Wolf owes a debt resulting from an injury he caused to Plaza Bank and ATG, and Wolf's actions were willful and malicious. See *Braverman*, 463 B.R. at 119.

Clearly, Plaza Bank and ATG were injured by Wolf's actions. Plaza Bank was a defendant with respect to only the quiet title count of the state court complaint. As to the quiet title portion of the Gambino Litigation, the state court found in favor of the plaintiffs that their title had been clouded by the actions of the defendants and entered judgment that "[a]ll purported instruments of title through which WW Funding, LLC and Plaza Bank claim any interest in [the Niles Property] are hereby declared void." *Gambino I*, No. 05CH4303 at 20-21. Plaza Bank appealed the State Court's judgment with respect to its finding to quiet title to the Niles Property, but the Illinois Appellate Court affirmed the State Court's findings with respect to the plaintiffs' claims to quiet title to all three subject properties, including the Niles Property. *Gambino III*, 398 Ill.App.3d at 61. As a result, Plaza Bank's mortgage lien on the Niles Property was voided, and the Niles Property no longer secured the loan to W.W. Funding. Under the mortgagee title insurance policy, ATG was then obligated to and did indemnify Plaza Bank by paying off the loan balance. ATG was also injured when it paid for the costs to defend W.W. Funding and Plaza Bank in the Gambino Litigation pursuant to its obligations under the issued policies of title insurance.

Unlike the element of willfulness, a debtor does not have to act with ill will or a specific intent to do harm to the creditor for the conduct to be malicious. See *Thirtyacre*, 36 F.3d at 700. "The test for maliciousness under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) done without just cause and excuse." *Basel Van Aswegen*, 366 B.R. at 869. It is the knowledge of wrongdoing and the absence of excuse that defines malicious behavior for purposes of section 523(a)(6). *Young*, 428 B.R. at 818. The existence of malice with respect to Wolf's actions was specifically determined in the Gambino Litigation. As discussed above, Wolf's malice caused monetary injury to Plaza Bank and ATG. Therefore, the Court finds that the element of malice has been proven.

The question is whether or not ATG has proven based on the surrounding circumstances that Wolf's actions were willful and malicious. *Jendusa-Nicolai*, 677 F.3d at 322; *Burke*, 398 B.R. at 626. Whether a debtor acted willfully and maliciously is a question of fact reserved for the trier of fact. *Burke*, 398 B.R. at 625.

Again, it is clear that Wolf, W.W. Funding and the other defendants in the Gambino Litigation participated in a fraudulent scheme with the intent to deprive Gambino and North Star of title to the three subject properties, including the Niles Property. That finding was clearly set forth in the State Court Decision. But a fraudulent scheme to defraud Gambino does not in and of itself prove that Wolf intended to cause harm to Plaza Bank or ATG, and would not stand to satisfy section 523(a)(6) if done in circumvention of another, more specific aspect of section 523 addressing fraud. *Gulevsky*, 362 F.3d at 964.

Plaza Bank and ATG were injured as a result of Wolf's intentional actions against Gambino. ATG must prove that Wolf actually intended to harm Plaza Bank and ATG, rather than Wolf merely acted intentionally as to Gambino and, thereby, harmed Plaza Bank and ATG. *See Burke*, 398 B.R. at 625-26. Or, ATG may pursuant to *Horsfall*, show that Wolf's actions were substantially certain to result in injury. 738 F.3d at 774-75.

ATG argues that Wolf knew, at a minimum, that it was highly likely that ATG would sustain injury from his causing ATG to issue title insurance for W.W. Funding's purchase of the Niles Property, because he knew that W.W. Funding was not obtaining good title to the Niles Property. *See, e.g., Jendusa-Nicolai*, 677 F.3d at 324. The Court agrees.

The State Court Decision makes it clear that Wolf knew he was participating in a fraudulent scheme and, therefore, had no legal justification to obtain a loan from Plaza Bank and to obtain an owners title insurance policy and make the representations he made on behalf of W.W. Funding to do both. Because of the ongoing scheme to defraud Gambino, Wolf also knew that injury to Plaza Bank was highly likely to result from such action because W.W. Funding did not have good title to the Niles Property and the Mortgage granted on behalf of W.W. Funding could not secure the loan. Wolf also knew that injury to ATG was highly likely to result from such action because ATG was obligated to defend Plaza Bank and W.W. Funding under the title insurance policies issued to both. Wolf's actions in obtaining the loan and title insurance policies were in continuance of the fraudulent scheme to deprive Gambino of title to the Niles Property.

Last, the question is raised whether ATG has raised sufficient grounds to establish its cause under 523(a)(6) independent from its cause under 523(a)(2)(A). *In re Gulevsky*, 362 F.3d at 964.[14] Here, the court is forced to conclude that it has not.

While it is the court's firm belief that ATG has established the elements of section 523(a)(6), ATG has done so by establishing the elements of a more specific section of 523 addressing fraud, section 523(a)(2)(A). At Trial, ATG raised no facts additional to those substantiating its section 523(a)(2)(A) claim. While the court believes that those section 523(a)(2)(A) facts are sufficient to establish the elements of a section 523(a)(6) claim, as a matter of law, it does not appear that ATG may proceed on this count. The Seventh Circuit's directions in this regard are precise: the specific statute must therefore govern the more general one. *Id.* Because of this and because a ruling under section 523(a)(6) would be superfluous,[15] court declines to open the Pandora's box identified by the Seventh Circuit in this regard, and must therefore decline to render judgment on Counts II and IV of the Complaint.

## CONCLUSION

As noted above and for the foregoing reasons, ATG has proven its cause of action under section 523(a)(2)(A) and section 523(a)(6), but will not be granted judgment under section 523(a)(6). The Debtor's debt on the Plaza Bank Loan and under the ATG Owners Title Insurance Policy is nonetheless nondischargeable. Accordingly, judgment will be entered in favor of ATG on Counts I and III of the Complaint.

---

14      Wolf did not move to dismiss on these grounds.

15      Given that ATG has established the elements of Counts I and III of the Complaint and that a debt is either nondischargeable or it is not, this does change the end result of today's ruling.

A separate Order will be issued concurrent with this Memorandum Decision.

Dated:  October 15, 2014

Timothy A. Barnes
United States Bankruptcy Judge